## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ARIANNA GOODMAN,
███████████
███████████,

SARAH SCOTT,
███████████████
█████████████████,

CHRISTINE BUCKEL,
██████████████████
█████████████████,

JENNIFER RAULIN,
██████████████
████████████████,

    individually, and on behalf of all
    others similarly situated,

        *Plaintiffs*,

  vs.

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce,
    1401 Constitution Avenue NW
    Washington, DC 20230,

U.S. DEPARTMENT OF COMMERCE,
    1401 Constitution Avenue NW
    Washington, DC 20230,

LAURA GRIMM, in her official capacity as
Acting Under Secretary of Commerce for
Oceans and Atmosphere and NOAA
Administrator,
    1401 Constitution Avenue NW
    Washington, DC 20230,

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
    1401 Constitution Avenue NW
    Washington, DC 20230,

Case No.: _____

**CLASS ACTION COMPLAINT**

AMY GLEASON, in her official capacity as
DOGE Administrator,
 1650 Pennsylvania Avenue NW
 Washington, DC 20504,

U.S. DOGE SERVICE,
 1650 Pennsylvania Avenue NW
 Washington, DC 20504,

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
 1650 Pennsylvania Avenue NW
 Washington, DC 20504,

CHARLES EZELL, in his official capacity as
Acting Director of U.S. Office of Personnel
Management,
 1900 E Street NW
 Washington, DC 20415,

U.S. OFFICE OF PERSONNEL
MANAGEMENT,
 1900 E Street NW
 Washington, DC 20415,

RUSSELL VOUGHT, in his official capacity
as Director of Office of Management and
Budget,
 725 17th Street NW
 Washington, DC 20503,

OFFICE OF MANAGEMENT AND
BUDGET,
 725 17th Street NW
 Washington, DC 20503,

    *Defendants*.

**INTRODUCTION**

1.       For months, the Trump Administration has engaged in extensive purges of the federal workforce.  A central justification offered by Administration officials, especially early on, was that the federal government was filled with poor performers.  These officials implied or outright stated that federal employees were lazy and inefficient.

2.       The Administration cast a particularly skeptical eye toward probationary employees.  In general, new hires at federal agencies are subject to a probationary period of one to two years before they become permanent employees entitled to certain civil service job protections.  Employees who are transferred or promoted to new positions often re-serve probationary periods in their new roles.

3.       Hours after President Trump was sworn into office earlier this year, the Office of Personnel Management (OPM) sent a memo to all agencies noting that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels."[1]  The memo also directed agencies to "identify all employees on probationary periods" and "send a report to OPM listing all such employees."[2]  OPM later instructed agencies to determine the "fitness" and "qualifications" of employees, and directed that "only the highest-performing probationers" in certain areas "should be retained."[3]  The obvious import of these communications, confirmed again and again by later government actions, was that poor-performing probationary employees should be terminated.

---

[1] Att. A (ECF No. 111-1), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).
[2] *Id.*
[3] Att. B (ECF No. 111-2), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025). .

1

4.      The implementation of this directive, however, soon became its own startling display of poor performance.  At the National Oceanic and Atmospheric Administration (NOAA) in particular, the Administration's attempt to identify poor performers was especially troubling.

5.      NOAA, located within the U.S. Department of Commerce (Commerce), is the nation's leading climate science agency.  NOAA and its subcomponents use an array of science, technology, and research to understand our environment and protect our natural resources.  Among many other things, NOAA's work includes severe storm warnings to keep our communities safe, seasonal weather forecasts that farmers rely on to plant and harvest their crops, management of U.S. fisheries to prevent overfishing and promote sustainable ecosystems, development of marine navigational charts for commercial ships and recreational boaters, and conservation of more than 160 endangered and threatened marine species.  From hurricane hunters collecting data in massive storms to underwater divers setting up local fish hatchery programs, NOAA's dedicated employees work every day to support and protect American communities.

6.      Plaintiff Arianna Goodman was a research ecologist at NOAA's Northwest Fisheries Science Center, where she advised on salmon and steelhead trout restoration in the Puget Sound.  On February 27, 2025, she received a termination notice by email.  The email quoted OPM's guidance on using the probationary period to "assess employee performance and manage staffing levels," and concluded that "the Agency finds that you are ***not fit for continued employment*** because your ability, knowledge and/or skills do not fit the Agency's current needs." NOAA has recently started issuing final HR documents that classify the probationary terminations as performance-related; Ms. Goodman expects to receive her form any day.

7.      But that just cannot be right.  Ms. Goodman had received uniformly positive feedback about her work, and her records contained no indication that she had ever done anything

2

other than meet or exceed expectations.  In fact, Ms. Goodman had recently received a performance-based pay increase, and one of her supervisors described her as "an outstanding performer" and "a tremendous employee" who was "integral" to her team's work.

8.    Hundreds of probationary employees at NOAA faced the same situation: permanent marks on their employment history stating they had been fired for cause based on performance issues that were entirely inconsistent with their personnel records.

9.    Adding injury to injury, when terminated employees applied for unemployment benefits, NOAA contested some of their applications.  To obtain unemployment benefits, many states require that applicants show that they lost their previous job through no fault of their own, such as in a layoff.  In at least some cases, to prevent probationary employees from getting these benefits, NOAA's representative appealed on the ground that the employee had been "discharged for failing to meet the employers [*sic*] performance expectations during the probationary period."[4]

10.   And even more recently, the government has issued demand letters to many of these same probationary employees seeking repayment of medical insurance premiums for pay periods after they were already fired—and during which they did not in fact have insurance coverage.[5]

11.   These many issues reveal significant records problems at NOAA, and they are actionable under the Privacy Act.  The Privacy Act requires government agencies to maintain records with "accuracy, relevance, timeliness, and completeness," and grants individuals a cause of action when an agency fails to do so and takes adverse action against them as a result.  5 U.S.C. § 552a(g)(1)(C).  By invoking job performance as the reason for these terminations—when

---

[4] Decl. E. Holbrook, Ex. 6 (ECF No. 222-6 at 21), *AFGE v. OPM*, 3:25-cv-01780 (N.D. Cal. June 5, 2025).
[5] https://www.nbcnews.com/science/science-news/fired-rehired-fired-noaa-employees-get-letters-demanding-money-rcna214755.

employees' records contained no evidence of the supposedly poor performance for which they were being fired—Defendants necessarily relied on records that were incomplete or inaccurate. The termination records themselves, in turn, were inaccurate as well. The demand for payment of health insurance premiums for periods of time when probationary employees were fired and uninsured similarly betrays significant recordkeeping issues.

12.    Defendants' decision to fire probationary employees for performance reasons—without a shred of support—was intentional, and appeared to be motivated in part by the Trump Administration's deep-seated animus toward federal workers. President Trump has likened federal workers to "cancer" and referred to the federal workforce as "crooked" and "dishonest." Elon Musk—the leader of DOGE, which instigated the probationary purge through OPM—compared federal workers to those who worked for Stalin, Mao, and Hitler. Commerce Secretary Howard Lutnick implied that those who complain about DOGE's cuts to government capacity are being dishonest: "A fraudster always makes the loudest noise, screaming, yelling and complaining." And Russell Vought, now a senior administration official, previously said that his goal in reforming the government was for federal workers to be "traumatically affected."

13.    Defendants have done just that by indiscriminately firing probationary workers at NOAA based on groundless claims about their job performance. In doing so, Defendants inflicted significant harm on Plaintiffs and others like them: in the blink of an eye, these individuals went from excelling in their dream jobs to searching for new employment with a for-cause termination on their record. This unexpected and dramatic disruption to these employees' careers has left them and their families reeling. Through the Privacy Act, Congress has provided for at least some relief.

## PARTIES

14.    Plaintiff Arianna Goodman is an individual who primarily resides in Seattle, Washington.  As of February 27, 2025, she was employed by NOAA as a research ecologist at the Northwest Fisheries Science Center.

15.    Plaintiff Sarah Scott is an individual who primarily resides in Gaithersburg, Maryland.  As of February 27, 2025, she was employed by NOAA as a management and program analyst in the Acquisitions and Grants Office.

16.    Plaintiff Christine Buckel is an individual who primarily resides in Beaufort, North Carolina.  As of February 27, 2025, she was employed by NOAA as a marine biologist in the National Centers for Coastal Ocean Science.

17.    Plaintiff Jennifer Raulin is an individual who primarily resides in Stevensville, Maryland.  As of February 27, 2025, she was employed as a program analyst in the Office for Coastal Management.

18.    Defendant Howard Lutnick is the Secretary of Commerce, the highest-level official in the Department.  He is sued in his official capacity.

19.    Defendant U.S. Department of Commerce (Commerce) is an agency within the meaning of the Privacy Act.  It is part of the executive branch of the United States government. *See* 15 U.S.C. § 1501.

20.    Defendant Laura Grimm is the Acting Under Secretary of Commerce for Oceans and Atmosphere and NOAA Administrator.  She is sued in her official capacity.

21.    Defendant National Oceanic and Atmospheric Administration (NOAA) is an agency within the meaning of the Privacy Act.  It is an executive branch agency and a component of Commerce.  *See* 84 Stat. 2090–2091 (1970).

22.    Defendant Amy Gleason is the DOGE Administrator.  She is sued in her official capacity.

23.    Defendant U.S. DOGE Service (DOGE) is an agency within the meaning of the Privacy Act.

24.    Defendant U.S. DOGE Service Temporary Organization is an agency within the meaning of the Privacy Act.  It is a subdivision within DOGE.

25.    Defendant Charles Ezell is the Acting Director of the U.S. Office of Personnel Management.  He is sued in his official capacity.

26.    Defendant U.S. Office of Personnel Management (OPM) is an agency within the meaning of the Privacy Act.  It is part of the executive branch of the United States government. *See* 5 U.S.C. § 1101.

27.    Defendant Russell Vought is the Director of the Office of Management and Budget. He is sued in his official capacity.

28.    Defendant Office of Management and Budget (OMB) is an agency within the meaning of the Privacy Act.  It is a subdivision within the Executive Office of the President.

**JURISDICTION AND VENUE**

29.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Privacy Act, 5 U.S.C. § 552a. The Privacy Act also grants this Court jurisdiction under 5 U.S.C. § 552a(g)(1).

30.    Venue is proper in this District under 5 U.S.C. § 552a(g)(5) because Plaintiffs Sarah Scott and Jennifer Raulin reside in this District, and also because at least some of the relevant agency records were situated at NOAA's offices located in Silver Spring, Maryland.  Venue is also proper under 28 U.S.C. § 1391(e)(1)(B) because, on information and belief, a substantial part of

the events or omissions giving rise to these claims occurred at NOAA's offices located in Silver Spring, Maryland; and under Section 1391(e)(1)(C) because Plaintiffs Sarah Scott and Jennifer Raulin reside in this District and no real property is involved in the action.

31.    Venue is proper in the Southern Division of the District of Maryland because Plaintiff Sarah Scott resides in Montgomery County and Defendants include U.S. agencies.  *See* Local Rule 501(4)(a)(ii).  Venue is also proper in the Southern Division because this case is a class action and, on information and belief, a substantial part of the events described in this complaint took place at NOAA's offices located in Silver Spring, Maryland.  *See* Local Rule 501(4)(b)(iii).

32.    Sovereign immunity is waived by 5 U.S.C. § 552a(g).

## BACKGROUND

### I.    Defendants Target Probationary Employees

33.    On January 20, 2025, hours after President Trump was sworn into office, Defendants Ezell and OPM issued a memorandum titled "Guidance on Probationary Periods, Administrative Leave and Details."[6]  In that memo, OPM "provid[ed] . . . guidance to agencies" about "probationary periods," including the guidance that "[p]robationary periods are an essential tool for agencies ***to assess employee performance*** and manage staffing levels."[7]  The memo also directed agencies to "identify all employees on probationary periods" and "send a report to OPM listing all such employees" by January 24, 2025—just four days later.[8]

34.    Between February 5 and February 10, OPM convened at least three calls with officials from numerous agencies to discuss the employment status of probationary employees.[9]

---

[6] Att. A (ECF No. 111-1), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).
[7] *Id.* (emphasis added).
[8] *Id.*
[9] Decl. N. Peters (ECF No. 77) ¶¶ 3–5, *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 10, 2025); AR0341 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).

35.     On February 5, 2025, OPM sent an email directing agencies to "provid[e] OPM with a list of probationary employees that includes the agency's decision as to whether the employee should be retained."[10]  Attached to that email was a "Probationary Employees Tracker" to "assist" agencies with compiling the requested information.[11]  That tracker included fields for employee-specific personnel data, including: "Name," "Position," "Status," "Employee Start Date," "Probation Start," "Probation End," and "Salary."[12]

36.     On February 12, 2025, OPM emailed agencies and "DOGE Leads" to "clarif[y] immediate next steps for probationary employees following OPM's guidance."[13]  That email directed agencies to "action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025, using the attached template letter."[14]  The only modification agencies were instructed to make to the template was "to account for whether the employee is in the competitive or excepted service."[15]  An email conveying similar information, along with the template termination letter, was sent to agency HR officials that same day.[16]

37.     Also in the February 12 email, agencies were directed to "update the previous probationary employee spreadsheet you've sent" to include employee-specific data, including "[w]hich probationary employees have been terminated," "an explanation" as to the employees who would be retained, whether "each probationary employee" had "opted into the deferred resignation program," whether the agency had "signed a written deferred resignation agreement"

---

[10] AR0346–0350 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).
[11] *Id.*
[12] *Id.*
[13] ECF No. 111-5, *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).
[14] *Id.*
[15] *Id.*
[16] AR0369 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).

with the employee, and "[p]robation end date."[17]  Agencies were instructed to send their updated trackers by 5:00 p.m. the next day, and then to "continue providing these reports daily through at least the end of the [following] week."[18]

38.    The template letter attached to OPM's February 12 email confirmed that the mass terminations of probationary employees were supposedly performance-based.  In the paragraph justifying the termination, the template expressly stated: "The Agency finds, ***based on your performance***, that you have not demonstrated that your further employment at the Agency would be in the public interest."[19]

39.    On February 13, 2025, OPM convened another call with agency chiefs of staff to discuss the termination of probationary employees.[20]  During that call, an OPM official read a script to those in attendance.[21]

40.    On February 14, 2025, OPM conducted a call with agency HR departments to discuss the termination of probationary employees.[22]

41.    Later that day, OPM emailed agency HR departments to "clarif[y] immediate next steps for probationary employees," repeating some of the same information from the February 12 email.[23]  In the February 14 email, OPM directed agencies to "separate probationary employees that [the agencies] have not identified as mission-critical no later than end of the day Monday,

---

[17] ECF No. 111-5, *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).
[18] *Id.*
[19] Ex. 1 (ECF No. 87-1), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 10, 2025) (emphasis added); *see also* AR0371–0372 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).
[20] Decl. N. Peters (ECF No. 77) ¶ 5, *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 10, 2025).
[21] *Id.*
[22] *Id.* ¶ 8.
[23] Att. B (ECF No. 111-2), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).

2/17," attaching the same "template letter" to carry out those terminations.[24]  The email also emphasized the importance of "individual employee performance."[25]  Specifically, OPM provided guidance on how to measure "[a]n employee's performance," instructed agencies to determine the "fitness" and "qualifications" of employees, and directed that "only the highest-performing probationers" in certain areas "should be retained."[26]

42.    The February 14 email once again directed agencies to "update" the "probationary employee spreadsheet" they had previously transmitted to OPM, including a "tracker" that listed key personnel data by employee such as: "[p]robation end date," whether "they have opted into the deferred resignation program," whether the agency had "signed a written deferred resignation agreement with them," "[w]hich probationary employees have been terminated," and "an explanation" for each probationary employee the agency "plan[ned] to keep."[27]  As before, OPM provided a "template Probationary tracker" that included fields for individual employees' data, including: "Name," "Position," "Status," "Should employee be retained?", "Employee Start Date," "Probation Start," "Probation End," "Salary," "Why do you want to retain?", "Opted in to DRP?", and "Signed DRP Agreement?"[28]  Agencies were instructed to submit the requested information by 8:00 p.m. on Monday, February 18.[29]  Going forward, agencies were directed to "continue providing these reports daily through at least the end of [the following] week."[30]

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] AR0379–0381 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).

[29] Att. B (ECF No. 111-2), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).

[30] *Id.*

43.    In follow-up emails, OPM requested that agencies submit "the daily tracker by 5:30pm each night so we can compile and send to WH by 6pm."[31]  On information and belief, "WH" referred to the White House and OMB.  OPM also explained its use of the daily data reports: "It is critical that this is reported back on a timely basis as we are rolling up into a consolidated dashboard each night."[32]

44.    OPM confirmed in another follow-up email that probationary terminations were based on performance: "Agencies should use the attached letter to separate from probationary employees, with the exception of high-performing employees in mission critical roles."[33]

45.    Consistent with OPM's directives, the purge of probationary employees began sweeping through agencies that same week.[34]  Thousands of workers were abruptly fired with no notice—to them or their supervisors.[35]  Affected employees received boilerplate termination notices that closely tracked the OPM template letter, telling them they were being fired for poor job performance, even where the employee had never received any negative performance reviews or feedback.[36]  Chaos unfolded at federal buildings throughout the country, as some workers were given less than 30 minutes to vacate their offices.[37]

---

[31] AR0382 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).
[32] *Id.* AR0383.
[33] AR0382 (ECF No. 218-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. May 9, 2025).
[34] https://perma.cc/5E5M-RUF9.
[35] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/.
[36] *Id.*
[37] https://perma.cc/9749-WLAZ; https://perma.cc/KB8S-4S8T.

46.     By Friday, February 14, at least 14,000 probationary employees had been fired[38] in what some called the "Valentine's Day Massacre."[39]   Throughout the weekend, the firings "extended to touch employees at almost every agency."[40]

47.     The terminations only continued from there.   On February 20, probationary employees were fired at the Environmental Protection Agency; the next day, the Pentagon announced that more than 5,000 probationary workers would be terminated.[41]

48.     Scenes at agencies across the government made evident a fundamental mismatch between the justification given for termination—poor performance—and the actual records of the impacted employees.  One employee fired at the General Services Administration had been rated "[a]bove fully successful" just months prior to their termination.[42]  A terminated worker at NIH, whose manager described her as "an invaluable asset," had been reviewed as having "[a]n outstanding year, consistently exceeding expectations."[43]  The Natural Resource Conservation Service fired an employee who the government had paid $20,000 to relocate just months before.[44] And an employee who had been fired from the Department of Veterans Affairs—despite positive ratings—was told by her boss: "Your performance has nothing to do with this."[45]

49.     More experienced employees were also caught up in the firings, even though the layoffs were purportedly meant to assess and evaluate new or recently hired workers.  Because

---

[38] https://www.washingtonpost.com/nation/2025/02/14/federal-employee-firings-effects-trump-doge/.
[39] https://perma.cc/KB8S-4S8T.
[40] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/.
[41] https://perma.cc/WDQ5-ZAG2.
[42] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/.
[43] *Id.*
[44] *Id.*
[45] *Id.*

some promotions or transfers can trigger a new probationary period, employees with years of experience and a proven track record—in some cases, so successful that they had earned a promotion—found themselves terminated on the basis of their supposedly poor performance.[46] One such employee, who had worked at the National Park Service for 25 years including in Yosemite, Shenandoah, and the Great Smoky Mountains, had recently moved to a new park to take a promotion.  Despite her quarter-century of service, she was fired as a probationary employee for "performance" reasons.[47]  Another employee who had more than five years of government employment was nonetheless terminated as a probationary employee because she recently switched agencies after moving under military orders with her spouse.[48]

50.    On February 24, 2025, as the terminations continued to unfold, OPM published a series of answers to Frequently Asked Questions about "[p]robationary [p]eriods."[49]  Like OPM's prior communications, the FAQs emphasized "individual employee performance."[50]  The email transmitting the FAQs to agencies had a similar focus, noting that "probationary periods are an essential step in evaluating employee performance," in part to make sure that "poor performers" do not "remain in the federal service" for "too long."[51]

51.    On February 26, 2025, Defendants Ezell and Vought, representing OPM and OMB respectively, issued joint guidance regarding Executive Order 14210, "Implementing the President's Department of Government Efficiency Workforce Optimization Initiative" (Feb. 11,

---

[46] https://apnews.com/article/donald-trump-probationary-federal-workers-doge-0eb7d59f42d0b07b2f7b98b044b90533; https://perma.cc/5T4T-M5H6.

[47] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/.

[48] *Id.*

[49] Att. C (ECF No. 111-3), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).

[50] *Id.*

[51] Att. D (ECF No. 111-4), *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).

2025).    That memorandum further emphasized the connection between the removal of probationary employees and the assessment of individual employee performance, directing agencies to reduce the federal workforce by "[r]emoving underperforming employees . . . and continuing to evaluate probationary employees."[52]

52.    While the probationary purge was in full swing, President Trump suggested at a Cabinet meeting that the cuts to the federal workforce were performance-related: "We're cutting down the size of government. . . . We have a lot of people that aren't doing their job."[53]

53.    More recent developments have similarly tied probationary terminations to employee performance.  Executive Order 14284, "Strengthening Probationary Periods in the Federal Service" (Apr. 24, 2025), provides that probationary periods are a "critical tool to assess the fitness of newly hired Federal employees."  *Id.* Sec. 1.  By failing to use probationary periods "effectively," the Order continues, agencies have "fail[ed] to remove poor performers" and "have often retained and given tenure to underperforming employees who should have been screened out during their probationary period."  *Id.*  The Order goes on to adopt a new rule requiring agencies to "utilize probationary and trial periods . . . to evaluate employees' fitness and whether their continuation of employment advances the public interest."  *Id.* Sec. 3, Civil Service Rule XI Sec. 11.5(a).  The Order also directs agency officials to review the "performance and conduct" of any remaining probationary employees.  *Id.* Sec. 5(b).

54.    OPM has also issued further guidance under Executive Order 14284 confirming that employee performance should be central to the removal of probationary employees.[54]  In a guidance memo signed by Defendant Ezell, OPM has explained that "[t]he EO underscores the

---

[52] https://perma.cc/Y35D-LH9G.
[53] https://perma.cc/K8YY-PRNT.
[54] https://perma.cc/8E8C-H784.

expectation of a high-performing Federal workforce."[55]  According to OPM, probationary periods should be used "to determine an employee's ability to actually perform the duties of the position."[56] OPM also emphasized the need for agencies to have "authority to separate an employee who does not perform acceptably" during the probationary period.[57]

55.    All of this is deeply detrimental to the employees who were wrongfully terminated as part of this campaign: a false or inaccurate performance-based justification tarnishes employees' reputations and may make it more difficult for them to find new jobs.  Impacted employees seeking new jobs are stuck trying to explain to prospective employers a formal for-cause termination and unfavorable determinations on their official government employment documents.  These harms are exacerbated by Defendants' consistent disparagement of federal workers as lazy.[58]  Without complete and accurate records that reflect their actual job performance, affected employees are materially disadvantaged in their efforts to secure new employment, and may face other collateral consequences.  These diminished employment prospects amount to significant pecuniary harm for impacted employees.

## II.    The Probationary Purge Hits NOAA

56.    Although NOAA's probationary employees were not included in the February 14 wave of terminations, the agency soon found itself in the Administration's crosshairs.

---

[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] https://www.washingtonpost.com/business/2025/01/29/elon-musk-opm-federal-workers-buyout-trump/.

57.    In early February 2025, DOGE representatives visited NOAA offices and gained access to the agency's IT systems.[59]  That same week, NOAA's top career HR official was placed on administrative leave.[60]

58.    On February 21, Defendant Lutnick was sworn in as Secretary of Commerce.

59.    Shortly thereafter, on February 27, hundreds of probationary employees at NOAA were abruptly fired with no notice or warning.[61]  In a pattern that was becoming familiar across the government, it was reported that NOAA officials had been ordered "to fire 'everyone on probationary status' . . . as part of the ongoing effort by President Donald Trump's administration to slash the size of the federal bureaucracy and budget."[62]  But not all probationary employees at NOAA were terminated.  As in other agencies, some NOAA supervisors were asked to provide written justifications for retaining probationary employees.

60.    That afternoon, affected employees received a boilerplate memorandum via email, notifying them that they were being terminated for cause during their probationary period.  On information and belief, the email used the exact same justification for every employee who was fired: "[T]he Agency finds that you are not fit for continued employment because your ability, knowledge and/or skills do not fit the Agency's current needs."

61.    Among those fired were researchers, biologists, ecologists, meteorologists, researchers, and computer engineers.[63]  Approximately 100 employees at the National Weather Service were terminated.[64]  Other impacted departments included the Hurricane Research

---

[59] https://perma.cc/AN42-DBE4; https://perma.cc/43P6-XEQJ.
[60] https://perma.cc/43P6-XEQJ.
[61] https://perma.cc/4WL7-MMCF.
[62] https://perma.cc/AN42-DBE4.
[63] https://perma.cc/J6BK-Q9LU; https://perma.cc/5QHJ-XV2K; https://perma.cc/4WL7-MMCF.
[64] https://perma.cc/J6BK-Q9LU; https://perma.cc/J4VD-WDL4.

Division, the Pacific Tsunami Warning Center, the Great Lakes Environmental Research Laboratory, the Environmental Modeling Center, the Geophysical Fluid Dynamics Laboratory, and the National Severe Storm Laboratory.[65]  For many fired employees, working at NOAA was a dream job they had been working to achieve for their entire career.

62.    These terminations caused significant disruption to agency operations.  Less than two weeks later, the National Weather Service (NWS) suspended some weather balloon launches due to staffing shortages.[66]  Within a month, at least 11 NWS offices around the country had suspended or reduced their balloon launches.[67]  By April, NWS was preparing for "degraded" operations due to "severe shortages" in staffing.[68]

63.    Supervisors at NOAA had little or no notice of who was being terminated, leading to mass confusion at offices across the agency.  At least one manager had to go door-to-door down an office hallway to ask who had been fired and who had been spared.  Terminated employees were given just a few hours to close out their work, say goodbye to their colleagues, collect their belongings, and leave.[69]

64.    Many of the NOAA employees fired in the probationary purge were not actually new to the agency or its work.  Some had worked with the same teams on the same projects for years as contractors before accepting a permanent position that triggered a probationary period.

---

[65] https://perma.cc/5QHJ-XV2K; https://perma.cc/J6BK-Q9LU; https://perma.cc/4WL7-MMCF; https://www.science.org/content/article/noaa-firings-hit-birthplace-weather-and-climate-forecasting/.
[66] https://perma.cc/77DM-32EY.
[67] https://perma.cc/KL5C-2BZY.
[68] https://www.nytimes.com/2025/04/16/climate/national-weather-service-forecast-doge-trump.html.
[69] https://www.nytimes.com/2025/02/27/climate/noaa-layoffs-trump.html.

Others had recently been promoted—likely on account of their strong performance—which had the effect of starting a new probationary period.

65.    The termination notices sent to NOAA employees closely tracked OPM's template letter and notices sent to probationary employees at other agencies, even down to the footnotes.

66.    The notices also reflected a rushed and incomplete process at NOAA and Commerce.  For many employees, one of the "position" fields was blank.  For others, the position was either flatly incorrect or a newly invented title they had never used before.  Confusing formatting and line-breaks suggest a sloppy mail-merge and/or a rudimentary copy-paste system. The agency later admitted that at least some of the terminations were "made in error."[70]

67.    Significantly, the job-performance justification given for the terminations did not match the experiences of impacted employees.  Employees who were purportedly terminated for poor performance had never once received unsatisfactory or unfavorable reviews or feedback.  To the contrary, many probationary employees terminated on February 27 had received stellar reviews, achieved the highest ratings, and been specifically informed by their supervisors that their performance met or exceeded expectations.  The justifications that supervisors had been asked to provide appear to have been entirely ignored: employees who were described as high performers were still indiscriminately fired.  And, on information and belief, the agency did not conduct ***any new performance assessments*** for individual employees before firing them.

68.    Defendants terminated probationary employees at NOAA for supposedly poor performance without a shred of support in the employees' personnel files.  Employees in different offices and components across the country suffered the same fate.  This striking consistency provides additional evidence that Defendants never actually conducted any kind of meaningful or

---

[70] https://perma.cc/7YQR-N8LZ.

individualized review of probationary employees' job performance before issuing hundreds of for-cause termination notices that were inconsistent with their existing records.

### III.    The Government Doubles Down On Performance As The Justification

69.    To date, the government has not offered any coherent explanation for the probationary purge at NOAA that paints it as anything other than a botched attempt to supposedly remove poor performers across the government.

70.    Initially, there were some signs that Defendants were attempting to back away from performance as the reason for the firings.  On March 4—critically, after the terminations at NOAA—OPM revised its January 20 memorandum to disclaim any performance-based directive: "Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees."[71]

71.    Similarly, in April 2025, Vice Admiral Nancy Hann, the Acting NOAA Administrator who issued the termination notices, provided a list of factors considered by decision makers that did not include job performance.  In a different written statement, Vice Admiral Hann separately confirmed that decision makers considered factors other than job performance.

72.    Later that month, after the Trump Administration had installed new political leadership at the Office of Special Counsel (OSC), that agency abandoned individual employee performance as the reason for the probationary purge.  In a template email denying probationary employees' claims, OSC told those employees that their firings were "more likely effected in accordance with the new administration's priorities than a decision personal to you."[72]

---

[71] https://perma.cc/KFP5-8SXL.

[72] https://thehill.com/homenews/administration/5260584-watchdog-office-special-counsel-probationary-federal-workers/.

73.    In May, however, Commerce and NOAA doubled down on the performance justification—even as a federal court had ordered them not to.  In response to a court order requiring agencies to provide employees "a written statement, directed to the employee individually, stating that their termination was not 'performance' or fitness based but was made as part of a government-wide mass termination,"[73] Commerce sent a generic, unaddressed PDF via BCC.  Instead of recanting the performance justification as required, Commerce recited the language of the Court's order, and then immediately described that order as "legally and factually erroneous, specifically with respect to the Department."[74]

74.    In response to a different court order, probationary employees at NOAA were briefly reinstated to paid administrative leave for a matter of weeks in March and April.  During that period, reinstated employees continued to pay for health insurance premiums through paycheck deductions.  But employees who tried to use their insurance were told that their coverage had been cancelled by Commerce and never reinstated.  In mid-April, days after the court order requiring reinstatement was stayed, probationary employees were terminated once again, and Commerce "revert[ed]" the "termination action[s]" to their "original effective date" of February 27, 2025—with no mention of any change or revision to the original performance-based justification.  Even after they were re-terminated, some employees were placed in a "leave without pay" status rather than being formally separated from the agency, which made it even more difficult to search for new employment and/or insurance coverage.

75.    Commerce and NOAA have now settled on poor job performance as having been the real justification all along.  Only recently have terminated employees started receiving SF-50

---

[73] *AFGE v. OPM*, 2025 WL 1150698, at *15 (N.D. Cal. Apr. 18, 2025).
[74] Decl. E. Holbrook, Ex. 5 (ECF No. 222-6 at 19), *AFGE v. OPM*, 3:25-cv-01780 (N.D. Cal. June 5, 2025).

forms.  These forms officially document an employee's separation from the government and can have lasting effects on an individual's ability to secure other jobs in the future.  Months after the probationary purge at NOAA, these forms are backdated to February and include codes that formally adopt unsatisfactory performance as the reason for the terminations.  Specifically, in Box 5-D, the SF-50s list as legal authority for the terminations 5 C.F.R. § 315.804, which provides for agency termination of a probationary employee because "his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment."  5 C.F.R. § 315.804(a).  The codes in Boxes 5-A and 5-C—385 and L2M/L4M, respectively— likewise refer to OPM rules associated with performance-based terminations.[75]  Defendants appear to have acknowledged that these codes reflect for-cause terminations, as OPM has since directed agencies terminating probationary employees to use ***different codes*** to "ensure that probationary or trial period terminations are ***not*** coded as being based on performance or conduct."[76]

76.     Further, as of mid-May, NOAA was contesting at least some former employees' applications for unemployment benefits, on the grounds that the terminations were based on poor performance.[77]

77.     OPM also appears to have once again adopted the view that the reason for the probationary terminations was individual employee performance.  In a deposition in March, a senior OPM official testified that the reason the agency was focused on probationary employees was to ensure that agencies were "using the probationary period to assess employee performance," undertaking "serious consideration" of employees' "performance," and "us[ing] these periods to

---

[75] https://perma.cc/HYW2-MBUB.
[76] https://perma.cc/YD43-5FW3 (emphasis added).
[77] Decl. E. Holbrook, Ex. 6 (ECF No. 222-6 at 21), *AFGE v. OPM*, 3:25-cv-01780 (N.D. Cal. June 5, 2025).

assess employee performance and see whether they have demonstrated their fitness for continued employment."[78]  That same official also testified that OPM asked agencies "to undertake a focused review of probationers and determine which ones met a certain high standard of performance."[79]

78.    Firing probationary employees in this way violated the Privacy Act.  Under that law, government agencies are required to maintain individuals' records—including employees' personnel files—with "accuracy, relevance, timeliness, and completeness."   5 U.S.C. § 552a(g)(1)(C).  Where an employee's personnel file includes nothing but favorable performance reviews and/or feedback, terminating that individual as "not fit for continued employment"—let alone contesting their application for unemployment benefits on the grounds that the termination was based on poor performance—can mean only one of two things: (1) the personnel files consulted by the decision maker were incomplete or inaccurate, as they did not correctly reflect assessments of that employee's performance; or (2) the performance-based justification for the termination, now reflected on official government records, was itself inaccurate.  Either way, Defendants' maintenance of inaccurate and/or incomplete records caused the employee to be fired.  That violates the Privacy Act and entitles Plaintiffs to compensation.

## IV.    Plaintiffs' Experiences

79.    Plaintiff **Arianna Goodman** is a resident of Seattle, Washington.  She holds a bachelor's degree in geology and biology, as well as a master's degree in water science.  Before joining NOAA as a federal employee, Ms. Goodman worked in the same office as a contractor for more than two years.  She also had previous experience working for the Washington Department of Fish and Wildlife and for the U.S. Geological Survey, among other things.

---

[78] Dep. Tr. N. Peters (ECF No. 188-1), at 30–31, *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 12, 2025).
[79] *Id.* at 132.

80.    As of February 27, 2025, Ms. Goodman worked as a research ecologist, in a probationary capacity, for the Northwest Fisheries Science Center in the National Marine Fisheries Service at NOAA.  In that role, Ms. Goodman primarily handled software development for a lifecycle modeling program that informs freshwater restoration efforts focused on salmon and steelhead trout.

81.    Although Ms. Goodman had only ever received uniformly positive feedback on her job performance, she was terminated on February 27 according to the same template memorandum sent to other probationary employees that asserted she was "not fit for continued employment" based on her "ability, knowledge, and/or skills."  Ms. Goodman's termination notice also appeared to include other errors, including a blank field where her position should have been listed, and a reference to her position in other places as "NOAA Federal Employee"—a vague, generic term with which Ms. Goodman was not familiar and did not accurately reflect the position in which she was serving (research ecologist).  Ms. Goodman's termination was effective as of 5:00 p.m. EST that day, less than two hours after the notice had been sent at 3:37 p.m. EST.

82.    Ms. Goodman's performance-based termination was entirely inconsistent with her actual record.  There had never been any indication in her personnel records or from any of her supervisors that she was not meeting or exceeding expectations.  In fact, in a mid-year performance review that was finalized after the probationary purge, a supervisor stated clearly that Ms. Goodman "was not let go for a performance issue[]."  The supervisor went on to explain that Ms. Goodman "was a tremendous employee" who was "integral" to the team's work, and that she was "an outstanding performer" who "met or exceeded our expectations."  In that same review, another supervisor "commend[ed]" Ms. Goodman "on how much [she] ha[d] accomplished in a short time."  Last year, Ms. Goodman received a performance-based pay increase.

23

83.      As a result of her unlawful termination, Ms. Goodman has suffered lost wages and other job benefits.  She was also forced to pay out-of-pocket for medical care she received in April when—unbeknownst to her—Commerce had cancelled her insurance coverage even though she had been reinstated to administrative leave and was paying health insurance premiums as deductions from her paycheck.  Since then, the new health insurance Ms. Goodman has acquired costs significantly more and covers less.  Ms. Goodman also faces reduced earning potential and diminished employment opportunities, as her permanent employment record now includes an unfavorable for-cause termination from her position at NOAA.  In addition, because of the abrupt nature of her termination, Ms. Goodman has incurred out-of-pocket costs associated with starting a new consulting business as new employment.

84.      Plaintiff **Sarah Scott** is a resident of Gaithersburg, Maryland.  She holds bachelor's and master's degrees in cybersecurity management and policy.  Before joining NOAA as a federal employee, Ms. Scott worked in the same office doing similar work for approximately 10 years.

85.      As of February 27, 2025, Ms. Scott worked as a management and program analyst, in a probationary capacity, in the Policy and Oversight Division of the Acquisitions and Grants Office at NOAA.  In that role, Ms. Scott supported scientists and meteorologists across the country by managing the technical, administrative, and financial systems critical to NOAA's contracting processes.

86.      Although Ms. Scott had only ever received uniformly positive feedback on her job performance, she was terminated on February 27 according to the same template memorandum sent to other probationary employees that asserted she was "not fit for continued employment" based on her "ability, knowledge, and/or skills."  Ms. Scott's termination notice also appeared to include other errors, including a blank field where her position should have been listed, and a

reference to her position in other places as "NOAA Federal Employee"—a vague, generic term with which Ms. Scott was not familiar and did not accurately reflect the position in which she was serving (management and program analyst). Ms. Scott's termination was effective as of 5:00 p.m. that day, less than two hours after the notice had been sent at 3:44 p.m.

87.    Ms. Scott's performance-based termination was entirely inconsistent with her actual job performance. There had never been any indication in her personnel records or from any of her supervisors that she was not meeting or exceeding expectations. Ms. Scott's supervisor was shocked to learn that Ms. Scott had been terminated, because the supervisor believed Ms. Scott to be a good performer. Indeed, Ms. Scott's supervisor had told her that her performance was exceptional. Ms. Scott had performed so well that she had recently been given new responsibilities, expanding her role with the agency.

88.    Ms. Scott recently received additional documentation from NOAA, including an SF-50 form ("Notification of Personnel Action") that codes her termination as performance-based. Specifically, Box 5 lists the following performance-related codes: 385, "TERM DURING PROB/TRIAL PERIOD," "L4M," and "REG 315.804 EQ."

89.    As a result of her unlawful termination, Ms. Scott has suffered lost wages and other job benefits. Ms. Scott was also forced to pay significant monthly premiums to keep her health insurance coverage, which was necessary to ensure she could continue receiving medical treatment for her back injury. Additionally, Ms. Scott has incurred expenses related to her search for a new job, including for IT equipment. Ms. Scott also faces reduced earning potential and diminished employment opportunities, as her permanent employment record now includes an unfavorable for-cause termination from her position at NOAA.

90.    Plaintiff **Christine Buckel** is a resident of Beaufort, North Carolina.  She holds a bachelor's degree in biology, as well as a master's degree in marine sciences.  Ms. Buckel worked as a permanent federal employee at the National Centers for Coastal Ocean Science in the National Ocean Service at NOAA for nearly 23 years.  She also has previous experience working for the state of Florida and as a NOAA contractor, among other things.

91.    Ms. Buckel began her NOAA career in 2002 working as a biological science technician.  In 2015, she was promoted to the position of marine ecologist.  In 2024, she was promoted again, this time to the position of marine biologist.  In that role, Ms. Buckel contributed to data and applications helping coastal communities better understand future impacts of sea level rise, including impacts to coastal habitats as well as critical infrastructure like schools, hospitals, and roads.  She also led the Coastal Ecosystem Prediction System Project, a nationwide effort that modeled how coastal habitats will change with rising sea levels and how those changes affect vulnerability to future storm surge impacts.  As a result of her most recent promotion, Ms. Buckel was working in a probationary capacity as of February 27, 2025.

92.    Although Ms. Buckel had only ever received uniformly positive feedback on her job performance, she was terminated on February 27 according to the same template memorandum sent to other probationary employees that asserted she was "not fit for continued employment" based on her "ability, knowledge and/or skills."  Ms. Buckel's termination notice did not accurately reflect her promotion last year, as the notice still referred to her old position as an "ecologist"— instead of her new position as a "biologist."  Ms. Buckel's termination notice also appeared to include other errors, including a blank field where her position should have been listed.  Ms. Buckel's termination was effective as of 5:00 p.m. that day, less than two hours after the notice had been sent at 3:49 p.m.

93.     Ms. Buckel's performance-based termination was entirely inconsistent with her actual job performance.  There had never been any indication in her personnel records or from any of her supervisors that she was not meeting or exceeding expectations.  In fact, Ms. Buckel's 2024 performance review described her work as "truly outstanding," "exemplary," and demonstrating "forward-thinking leadership," and the review listed "[n]o deficiencies" with respect to any aspects of her job performance.  That remained true through her entire tenure in NOAA: a review completed less than ten days before Ms. Buckel was terminated described her as "an exceptional employee" who "contributes significantly" to her office's work, and listed "no suggestions for improvement at this time."  Ms. Buckel also received a performance-based pay increase last year.

94.     Ms. Buckel recently received additional documentation from NOAA, including an SF-50 form ("Notification of Personnel Action") that codes her termination as performance-based.  Specifically, Box 5 lists the following performance-related codes: 385, "TERM DURING PROB/TRIAL PERIOD," "L2M," and "REG 315.804."  Ms. Buckel also received an agency certification regarding her life insurance benefits that reflected a different employee's name, date of birth, and social security number.

95.     As a result of her unlawful termination, Ms. Buckel has suffered lost wages and other job benefits.  The new health insurance that was available to Ms. Buckel after she lost coverage through her job at NOAA is more expensive and covers less care.  Ms. Buckel's abrupt and inaccurate termination also caused harms to her mental and physical health, for which she has sought and paid for treatment.  Moreover, Ms. Buckel faces reduced earning potential and diminished employment opportunities, as her permanent employment record now includes an unfavorable for-cause termination from her position at NOAA.  Ms. Buckel has additionally incurred out-of-pocket expenses related to her search for a new job, including office supplies.

96.     Plaintiff **Jennifer Raulin** is a resident of Stevensville, Maryland.  She holds a bachelor's degree in marine science affairs and a master's degree in marine affairs and policy. Before joining NOAA, Ms. Raulin worked on coastal management issues at the Maryland Department of Natural Resources for 17 years.  For 11 of those years, Ms. Raulin served as the director of the Chesapeake Bay National Estuarine Research Reserve - Maryland, a NOAA/State partnership program.  Ms. Raulin also had previous experience working at the Chesapeake Bay Trust in grants and program management.

97.     Ms. Raulin was hired to work at NOAA just six weeks before she was terminated. As of February 27, 2025, Ms. Raulin worked as a program analyst, in a probationary capacity, for the Office for Coastal Management in the National Ocean Service at NOAA.  As NOAA's primary liaison for the Delaware, Maryland, and Virginia Reserves and as the regional coastal management specialist for the North Region (covering New England, the Great Lakes, and Mid-Atlantic), Ms. Raulin managed cooperative agreements and grant programs and built partnerships to support decision makers on coastal management issues.

98.     Although Ms. Raulin had received only uniformly positive feedback on her job performance, she was terminated on February 27 according to the same template memorandum sent to other probationary employees that asserted she was "not fit for continued employment" based on her "ability, knowledge and/or skills."  Ms. Raulin's termination notice also appeared to include other errors, including a blank field where her position should have been listed.  Ms. Raulin's termination was effective as of 5:00 p.m. that day, less than two hours after the notice had been sent at 3:51 p.m.

99.     Ms. Raulin's performance-based termination was entirely inconsistent with her actual job performance.  Although Ms. Raulin had worked at NOAA for only a brief time, she had

already received positive feedback on her job performance, and there had never been any indication in her personnel records or from any of her supervisors that she was not meeting or exceeding expectations. In fact, in an initial performance review completed less than ten days before she was terminated, Ms. Raulin's supervisor stated that she "has made immediate impact," "worked proactively . . . to problem solve," and has "exhibited excellent teamwork skills." Ms. Raulin's supervisor continued: "We are extremely pleased with her initial efforts in this position and are relying heavily on her long term experience in the region and with the program." Ms. Raulin was nonetheless terminated based on inadequate job performance the following week.

100.    Ms. Raulin recently received additional documentation from NOAA, including an SF-50 form ("Notification of Personnel Action") that codes her termination as performance-based. Specifically, Box 5 lists the following performance-related codes: 385, "TERM DURING PROB/TRIAL PERIOD," "L2M," and "REG 315.804."

101.    As a result of her unlawful termination, Ms. Raulin has suffered lost wages and other job benefits. She has also incurred additional out-of-pocket costs for medical care due to the higher deductible that applies to the health insurance she acquired after she lost coverage through her job at NOAA. Ms. Raulin has additionally incurred out-of-pocket travel expenses related to her search for a new job. Ms. Raulin also faces reduced earning potential and diminished employment opportunities, as her permanent employment record now includes an unfavorable for-cause termination from her position at NOAA.

102.    This lawsuit is not about whether government downsizing is a good idea, or whether Defendants complied with civil service protections or merit system principles. Instead, this lawsuit is focused on whether, in deciding to terminate probationary employees like Plaintiffs ***on the basis of their supposedly unacceptable job performance***, Defendants failed to comply with their

obligations under the Privacy Act. In fact, these performance-based terminations were caused by Defendants' willful and intentional failure to maintain complete, accurate, timely, and/or relevant personnel records regarding employee performance in connection with the purge of probationary employees. As a result, Plaintiffs have suffered a variety of financial, medical, emotional, and professional harms, for which the Privacy Act allows compensation.

## V.    The Architects of the Probationary Purge

103.    On information and belief, the probationary purge—including at NOAA—was the result of a coordinated effort by the leaders of OPM, DOGE, OMB, Commerce, and NOAA.

104.    On information and belief, Elon Musk was deeply involved in efforts to fire probationary employees, particularly through OPM and DOGE. On information and belief, Mr. Musk was acting as the *de facto* head of DOGE.

105.    After inauguration, DOGE quickly became embedded at OPM.[80] Mr. Musk himself personally visited OPM's headquarters in Washington, DC.[81]

106.    Mr. Musk's allies have also been placed in prominent roles at DOGE, OPM, and Commerce. Amanda Scales, for example, previously worked at xAI—a company owned by Mr. Musk.[82] After President Trump took office, Scales joined DOGE and was placed in a senior role at OPM, where she was involved in the probationary terminations and listed several times as a point of contact for agencies' probationary-employee reports to OPM.[83] In addition, Anthony Armstrong is a member of DOGE and a senior OPM official with ties to Mr. Musk from his prior

---

[80] https://perma.cc/43P6-XEQJ.
[81] https://perma.cc/TL7F-8B4Z.
[82] https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.
[83] https://perma.cc/L73C-269Q.

work as a banker at Morgan Stanley.[84]  Michael Grimes, who previously worked as a banker and advised Mr. Musk on his high-profile purchase of Twitter, was a senior official at Commerce.[85]

107.    DOGE also had ties to Commerce and NOAA specifically.  DOGE placed staffers and allies at Commerce and NOAA, including Bryton Shang, Nikhil Rajpal, Gavin Kliger, and Michael Grimes.[86]  Prior to his appointment as Secretary of Commerce, Defendant Lutnick had "discussed" government "waste" with "Elon Musk."[87]  Since then, Secretary Lutnick has expressed his appreciation for Mr. Musk's "help" at the Department of Commerce and called Mr. Musk a "partner" to the agency.[88]

108.    Supervisors, managers, and directors across NOAA had little or no input in the terminations, suggesting that decisions were made at much higher levels.  Reporting suggests that NOAA leadership was pressured by DOGE to implement the firings.[89]  Vice Admiral Hann, NOAA's Acting Administrator at the time, stated that she was "directed to issue terminations for individuals on a list provided to me."[90]  According to Vice Admiral Hann, decisions about who to terminate were made by a group that included senior Commerce officials.[91]

109.    On information and belief, in carrying out the probationary purge, Defendants maintained records regarding NOAA employees within the meaning of the Privacy Act.  5 U.S.C. § 552a(a)(3)-(4).  In particular, the lists of probationary employees that OPM collected from

---

[84] https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.
[85] https://www.nytimes.com/2025/01/29/us/politics/morgan-stanley-grimes-trump-commerce.html.
[86] https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.
[87] https://finance.yahoo.com/video/employees-must-loyal-trump-lutnick-131622671.html.
[88] https://www.nbcnews.com/politics/trump-administration/commerce-secretary-lutnick-americans-shouldnt-brace-recession-rcna195522.
[89] https://www.eenews.net/articles/house-dems-acting-noaa-chief-didnt-willingly-approve-firings/.
[90] https://perma.cc/8GL7-XLAQ.
[91] *Id.*

agencies and forwarded to the White House—on a daily basis at times—necessarily included data and records about individuals, which are "records" under the Privacy Act.

110.    On information and belief, DOGE, OPM, and OMB (as well as Commerce and NOAA), along with their respective leaders and senior officials, were each endowed with and exercised substantial authority independent of the President in undertaking this task, including by ordering or recommending terminations without consulting with the President.

## VI.    The Trump Administration's Hostility Toward Federal Workers

111.    The Trump Administration and its senior officials, including the architects of the probationary purge, have long despised federal agencies and the employees who work there.  This deep-seated animus toward federal workers like Plaintiffs drove Defendants to find any way they could—lawful or otherwise—to gut the federal workforce through mass layoffs, including by taking shortcuts when it comes to accurate records.

112.    On his first day in office, President Trump likened federal workers to "cancer." While signing an executive order that would make it easier to fire career federal employees, Trump stated: "We're getting rid of all the cancer."  He continued: "I call it cancer, the cancer caused by the Biden administration."[92]  At his first Cabinet meeting, President Trump referred to the federal workforce as "sloppy."[93]  Even before the 2024 election, then-candidate Trump called federal employees "crooked" and "dishonest people" who are "destroying this country."[94]  Now-Vice President J.D. Vance previously said that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people."[95]

---

[92] https://perma.cc/8DZ4-KD53.
[93] https://perma.cc/7X63-9J3E.
[94] https://perma.cc/H2HV-RHUH.
[95] https://perma.cc/TW52-DZGU.

113.    Defendant Vought infamously called for the villainization of civil servants (or worse): "We want the bureaucrats to be traumatically affected."  "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains.  We want their funding to be shut down so that the EPA can't do all of the rules against our energy industry because they have no bandwidth financially to do so.  We want to put them in trauma."[96]  In addition, Mr. Vought contributed to Project 2025, which specifically called for NOAA to be dismantled and broken up.[97]  Mr. Vought's 2023 proposed federal budget, written while he was still at the Center for Renewing America, also called for significant cuts to NOAA.[98]

114.    Mr. Musk's derogatory statements about the federal workforce are also well-documented.  Of the workers at the U.S. Agency for International Development, Mr. Musk quipped "[i]t became apparent that what we have here is not an apple with a worm in it, what we have actually, just a ball of worms."[99]  In discussing the need for widespread layoffs, Mr. Musk described federal agencies as "unconstitutional."[100]  Later that week, in explaining his call to "delete entire agencies," Mr. Musk referred to federal agencies (and by implication the employees who worked there) as "weed[s]" that needed to be "remove[d]": "If we don't remove the roots of the weed, then it's easy for the weed to grow back."[101]  And Mr. Musk drew outrage by reposting (before later deleting) a tweet that alluded to federal workers as genocidal murderers: "Stalin, Mao, and Hitler didn't murder millions of people.  Their public sector employees did."[102]

---

[96] https://perma.cc/8PTU-ZQ2T.
[97] https://www.nytimes.com/2025/02/27/climate/noaa-layoffs-trump.html.
[98] https://perma.cc/V39W-Q4CM.
[99] https://perma.cc/37AL-C477.
[100] https://perma.cc/6PLH-K97J.
[101] https://perma.cc/4Q6M-YTHV.
[102] https://perma.cc/86VE-7PYE.

115.    For his part, Defendant Lutnick implied that those complaining about DOGE cuts to government capacity (in the context of Social Security benefits) were being dishonest: "A fraudster always makes the loudest noise, screaming, yelling and complaining."[103]

116.    On information and belief, this animus toward federal workers led Defendants to intentionally and/or willfully violate the Privacy Act by relying on inaccurate and/or incomplete personnel records to terminate probationary employees, including at NOAA, for supposedly "poor performance" without any supporting evidence or documentation.

117.    Defendants' conduct in carrying out these terminations also betrayed a consciousness of wrongdoing.  Reporting has indicated that "[t]he people who were charged with conducting the terminations seemed to have acted in a way that would minimize paper trails . . . making it difficult for others at the agency to know who was affected and leaving news of the firings to spread by word of mouth."[104]

## CLASS ALLEGATIONS

118.    Plaintiffs bring this action on behalf of themselves and on behalf of the members of the following class under Federal Rules of Civil Procedure 23(b)(1), (b)(2), (b)(3), and/or (c)(4):

> *All individuals who (1) were employed by the U.S. Department of Commerce, in the National Oceanic and Atmospheric Administration, in a probationary status (including trial periods or other types of probation) as of February 27, 2025; and (2) received a "Notification of Termination During Trial Period" dated on or around February 27, 2025.*

119.    Subject to additional information obtained through further investigation and discovery, the proposed class definition may be revised, amended, expanded, and/or narrowed.

---

[103] https://perma.cc/UV55-J3ZA.
[104] https://perma.cc/5QHJ-XV2K.

120.    The class definition provides clear, objective criteria that class members and Defendants can understand, and it allows the parties to identify the members of the class according to official personnel records.

121.    Plaintiffs and class members were injured by the same unlawful conduct, namely, Defendants' termination of probationary employees at NOAA in violation of 5 U.S.C. § 552a.

122.    The proposed class would meet the requirements of Rule 23(a).

a.    The class is so numerous that joinder of all members is impractical.  On information and belief, the proposed class includes hundreds of similarly situated employees. Although the exact number and identity of class members is unknown to the Plaintiffs at this time, publicly available materials and interviews with potential class members suggest that the proposed class includes 600 to 900 people.[105]  On information and belief, the number and identity of class members can be ascertained through appropriate discovery of agency files, records, and data.

b.    There are questions of law or fact common to the class.  Among others, questions common to the class include:

i.    whether Defendants failed to maintain Plaintiffs' records, including records regarding employee performance, with accuracy, relevance, timeliness, and/or completeness;

ii.    whether Plaintiffs suffered adverse determinations;

iii.    whether Defendants' failure to maintain Plaintiffs' records consistent with the agencies' obligations under the Privacy Act caused determinations adverse to Plaintiffs;

iv.    whether Defendants acted intentionally and/or willfully in failing to maintain Plaintiffs' records consistent with the agencies' obligations under the Privacy Act;

---

[105] https://perma.cc/4WL7-MMCF; *see also* Ex. 1 (ECF No. 103-1) at 6, *Maryland v. USDA*, No. 1:25-cv-00748 (D. Md. Mar. 25, 2025).

      v.     whether Commerce and/or NOAA disseminated inaccurate records about individuals;

      vi.    whether Commerce and/or NOAA undertook reasonable efforts to verify those records' accuracy before dissemination;

      vii.   whether the dissemination of inaccurate records by Commerce and/or NOAA caused adverse effects to Plaintiffs; and

      viii.  whether Commerce and/or NOAA acted intentionally and/or willfully in disseminating inaccurate records.

    c.    Plaintiffs' claims are typical of those of the class.  Like the class, the named Plaintiffs were terminated from NOAA during probationary periods, using the same boilerplate memorandum, purportedly due to inadequate job performance.  Plaintiffs' claims arise from the same common course of conduct giving rise to class members' claims, namely, Defendants' implementation of the probationary purge at NOAA in violation of the Privacy Act.  Plaintiffs also seek certain forms of relief that are common to the class, namely, a declaratory judgment.

    d.    Plaintiffs will fairly and adequately protect and represent the interests of the class.  Plaintiffs' interests are aligned with, and not contrary to, the interests of the class, and Plaintiffs are committed to vigorous prosecution of these claims on behalf of class members.  Plaintiffs are represented by competent counsel experienced in class action practice and litigation against the federal government.

    123.    The proposed class would also meet the requirements of Rule 23(b).

    a.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

    b.    The prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter,

would be dispositive of the interests of other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

        c.     Defendants have acted or refused to act on grounds that apply generally to the class, making declaratory relief appropriate with respect to the class as a whole.

        d.     Common issues of law or fact, including those listed in paragraph 122, predominate over individual issues arising from class members' claims against Defendants for terminating probationary employees at NOAA in violation of the agencies' obligations under the Privacy Act.  If necessary, the class may be certified pursuant to Federal Rule of Civil Procedure 23(c)(4) with respect to particular issues, including liability, in which case common questions within the certified issues will predominate over any individual ones.

        e.     A class action is superior to other available methods for fairly and efficiently adjudicating this dispute.  Individual joinder of all members of the class is impracticable, and a class action will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense associated with numerous individual actions.  The benefits of proceeding with a class action, including providing injured individuals with an opportunity to obtain relief for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in managing this class action.

## CLAIMS

## COUNT 1: VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(g)(1)(C) (AS TO ALL DEFENDANTS)

124.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

125.    5 U.S.C. § 552a(g)(1)(C) provides that "[w]henever an agency . . . fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness

as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual . . . the individual may bring a civil action against the agency."

126.    Defendants' maintenance of inaccurate, irrelevant, untimely, and/or incomplete personnel records caused them to terminate Plaintiffs' employment, supposedly based on poor job performance, which was an adverse determination.

127.    Following Plaintiffs' terminations, Defendants have further maintained inaccurate, irrelevant, untimely, and/or incomplete personnel records related to the unlawful terminations.

128.    As a result, Plaintiffs have suffered harm, including actual damages.

129.    All Defendants are "agencies" as defined by 5 U.S.C. § 552a(1).

130.    Defendants acted intentionally and/or willfully.

131.    Administrative exhaustion is not required for damages claims under the Privacy Act.  Plaintiffs have no alternative recourse for these Privacy Act violations.

### COUNT 2: VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(g)(1)(D), (e)(6) (AS TO DEFENDANTS LUTNICK, COMMERCE, GRIMM, AND NOAA)

132.    Plaintiffs reincorporate by reference the allegations in paragraphs 1–123.

133.    5 U.S.C. § 552a(g)(1)(D) provides that "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency."

134.    5 U.S.C. § 552a(e)(6) provides that "[e]ach agency that maintains a system of records shall . . . prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make

reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes."

135.    When NOAA, on behalf of Commerce, disseminated termination notices stating that Plaintiffs' terminations were based on performance, those were inaccurate records about individuals.

136.    When NOAA, on behalf of Commerce, disseminated SF-50s stating that Plaintiffs' terminations were based on performance, those were inaccurate records about individuals.

137.    On information and belief, Commerce and NOAA knew that these records were inaccurate—or otherwise had not undertaken reasonable efforts to verify their accuracy—and disseminated them anyway.  Commerce and NOAA acted intentionally and/or willfully.

138.    Commerce and NOAA are "agencies" as defined by 5 U.S.C. § 552a(1).

139.    Commerce and NOAA maintained systems of records, from which the termination notices and SF-50s were drawn.

140.    The dissemination of these inaccurate records caused adverse effects to Plaintiffs: they have suffered diminished employment opportunities and other consequences of carrying a for-cause termination on their employment record forever.

141.    As a result, Plaintiffs have suffered harm, including actual damages.

142.    Administrative exhaustion is not required for damages claims under the Privacy Act.  Plaintiffs have no alternative recourse for these Privacy Act violations.

**COUNT 3: DECLARATORY JUDGMENT ACT**
**(AS TO ALL DEFENDANTS)**

143.    Plaintiffs reincorporate by reference the allegations in paragraphs 1–123.

144.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.  There is an actual controversy within this Court's jurisdiction, and a declaration of rights

is necessary to remedy continuing harm resulting from Defendants' maintenance of inaccurate, irrelevant, untimely, and/or incomplete records to wrongfully terminate Plaintiffs supposedly on the basis of poor job performance.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs request that the Court award the following relief:

a.      Award Plaintiffs actual damages under 5 U.S.C. § 552a(g)(4)(A), in an exact amount to be determined at trial but no less than $1000 per person;

b.      Grant a declaratory judgment under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 that Defendants' maintenance of inaccurate, irrelevant, untimely, and incomplete records in connection with the mass termination of probationary employees at NOAA was unlawful;

c.      Award Plaintiffs reasonable costs and attorney's fees as provided in 5 U.S.C. § 552a(g)(4)(B);

d.      Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

e.      Grant such other relief as the Court may deem just and proper.

Dated: June 30, 2025            Respectfully submitted,

                           */s/ Jessica Merry Samuels*

                           Jessica Merry Samuels (Bar No. 31701)
                           Clayton L. Bailey*
                           **Civil Service Law Center LLP**
                           1325 G Street NW, Suite 500, PMB 801
                           Washington, DC 20005
                           (202) 571-7840
                           jsamuels@civilservicellp.com

                           *application for admission approved pending admission ceremony