**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ARIANNA GOODMAN, et al.,

*Plaintiffs*,

vs.

HOWARD LUTNICK, in his official capacity as Secretary of Health and Human Services, et al.,

*Defendants*.

Case No.: 8:25-cv-02097-LKG

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Legal Background ..... 2

i. The Privacy Act of 1974 ..... 2

ii. The Civil Service Reform Act of 1978 ..... 4

B. Factual Background ..... 5

LEGAL STANDARDS ..... 7

ARGUMENT ..... 8

I. Defendants' jurisdictional argument fails. ..... 8

A. This Court should follow precedent holding that the CSRA does not preclude federal employees from bringing Privacy Act claims in federal court. ..... 8

B. The statutory text does not support preclusion under Supreme Court precedent. 11

C. To the extent relevant, the *Thunder Basin* framework favors Plaintiffs. ..... 17

D. Although not required, the CSRA's review process has been exhausted. ..... 19

II. Plaintiffs plausibly allege Privacy Act violations under Rule 12(b)(6). ..... 20

A. Plaintiffs plausibly allege a violation of 5 U.S.C. § 552a(g)(1)(C) (Count 1). ..... 20

B. Plaintiffs plausibly allege a violation of 5 U.S.C. § 552a(e)(6) (Count 2). ..... 22

III. Defendants' remaining Rule 12(b)(6) arguments fail. ..... 24

A. Defendants' "collateral attack" argument repackages their factual challenges. ..... 24

B. Plaintiffs plausibly allege that Defendants' Privacy Act violations were "intentional or willful." ..... 26

C. Plaintiffs plausibly allege compensable damages. ..... 27

D. All Defendants are properly named. ..... 29

**TABLE OF CONTENTS (cont.):** **PAGE**

E. Defendants' remaining arguments are readily dispensed with............................. 30

CONCLUSION.................................................................................................................. 30

## INTRODUCTION

This case arises from the decision by the National Oceanic and Atmospheric Administration (NOAA), made in concert with other Defendants, to fire nearly one thousand employees earlier this year as "not fit for continued employment." Compl. ¶ 60. But Plaintiffs—four workers who were terminated—had never received a negative performance review. Given this discrepancy, Plaintiffs contend that the records Defendants relied on in carrying out their terminations must have been inaccurate or incomplete, in violation of Defendants' obligations under the Privacy Act. Plaintiffs filed this class action lawsuit to recover damages they and their former colleagues have suffered because of Defendants' records-related violations. Defendants moved to dismiss, arguing that Plaintiffs' claims are precluded by the Civil Service Reform Act (CSRA) and fail under the Privacy Act. The motion to dismiss should be denied.

Defendants' argument that the CSRA precludes Plaintiffs' Privacy Act claims fails to persuade. Although the Fourth Circuit has never addressed the issue in a published decision, Defendants' theory was long ago rejected by the D.C. Circuit in *Hubbard v. EPA Administrator*, 809 F.2d 1 (D.C. Cir. 1986), a case on which Defendants themselves rely. Outside of court, even the Department of Justice has recognized that "the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act claim for damages." *Infra* n.1. The D.C. Circuit's approach may not have been adopted by every circuit, but it is supported by the text of the relevant statutes and recent Supreme Court precedent instructing that courts are "not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). The authorities advanced by Defendants are, by contrast, a poor fit for claims under the Privacy Act, which grants jurisdiction exclusively to the district courts. If this Court cannot hear Plaintiffs' claims, no one can.

Defendants' Rule 12(b)(6) arguments, meanwhile, misunderstand Plaintiffs' claims. Defendants insist that the complaint "alleges only that Plaintiffs' terminations were unlawful because Plaintiffs believe that they were actually good workers" (Mem. 6), but that is wrong. Plaintiffs' history of performance is not subjective; federal workers receive regular performance reviews that are maintained as personnel records. And the complaint pleads in detail Defendants' consistent emphasis on job performance in downsizing the federal workforce. Plaintiffs therefore allege that the records consulted by decisionmakers must have inaccurately or incompletely reflected Plaintiffs' history of uniformly positive reviews, causing them to be fired—incorrectly—due to poor performance. Plaintiffs further contend that official termination records reflecting the inaccurate performance-based justifications for their firings were similarly unlawful. These claims, and the allegations supporting them, satisfy the relevant pleading standards.

Defendants may believe it is good policy for all cases that touch on federal employment to be adjudicated by administrative boards in the Executive Branch (or not at all). But when it comes to the Privacy Act—a law passed to restrain the Executive in the aftermath of Watergate—Congress determined that these claims should be heard by the judiciary. Properly in federal court, Plaintiffs are entitled at this stage to the truth of their allegations and all reasonable inferences that can be drawn from them. Defendants' motion should be denied.

## BACKGROUND

### A. Legal Background

#### *i. The Privacy Act of 1974*

Passed in the wake of the Watergate and COINTELPRO scandals, the Privacy Act was designed "to restore trust in government" by defining what information the government was permitted to collect and how that information may be maintained and used. *Overview of the*

*Privacy Act: 2020 Edition*, U.S. Dep't of Justice, https://perma.cc/VJE8-YULF (DOJ Overview).[1] The Act "gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply." *Doe v. Chao*, 540 U.S. 614, 618 (2004).

The Privacy Act's protections apply to federal employees. The statute's requirements cover any "individual," defined to include citizens and lawfully admitted residents, whose "record[s]" are "maintained by an agency." 5 U.S.C. § 552a(a)(2), (a)(4), (g). That group plainly encompasses people who work for the government. Elsewhere, the text of the statute confirms that federal employees fall within its reach, by providing additional protections (not at issue here) to "holders of positions as Federal personnel," § 552a(o)(1)(D)(ii), in situations involving "Federal personnel or payroll records," § 552a(a)(8)(A)(ii), and when "records predominantly relating to Federal personnel" are used "to take any . . . adverse action against Federal personnel," § 552a(a)(8)(B)(v).

The Privacy Act provides four separate causes of action, 5 U.S.C. § 552a(g); *see also Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025), two of which are relevant here. Count 1 arises under § 552a(g)(1)(C), which provides a claim when an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual." Count 2 arises under § 552a(g)(1)(D), which provides a claim when an agency "fails to comply with any other provision of [the Privacy Act] . . . in such a way as to have an adverse effect on an individual."

---

[1] This publication is available for download in full on the Department's website here: https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition.

Plaintiffs here allege a violation of § 552a(e)(6), which provides that agencies "shall . . . prior to disseminating any record about an individual to any person other than an agency . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." The Privacy Act waives sovereign immunity for violations that are "intentional or willful." § 552a(g)(4)(A). A plaintiff who can prove any pecuniary loss is entitled to statutory damages of $1,000 or "actual damages," whichever is greater. § 552a(g)(4)(B).

"By its very terms," the Privacy Act "limits jurisdiction over Privacy Act matters to the federal district courts." DOJ Overview, https://perma.cc/W9G2-BFB7. Section § 552a(g)(1) provides this exclusive jurisdiction: "the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection." As a result, neither the Merit Systems Protection Board (MSPB) nor any other court or administrative body has jurisdiction to adjudicate Privacy Act claims. *See, e.g.*, *Carell v. Merit Sys. Prot. Bd.*, 131 F. App'x 296, 299 (Fed. Cir. 2005) ("[C]laims under the Privacy Act must be brought in federal district court."). That exclusivity covers violations of the statute and "any rule promulgated thereunder." *See* 5 U.S.C. § 552a(g)(1)(D).

*ii. The Civil Service Reform Act of 1978*

Passed just four years after the Privacy Act, the CSRA was designed "to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service." CSRA, Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (Oct. 13, 1978). Among other things, the CSRA "provide[d] greater protection of individual Federal employee rights" and "provide[d] greater protection of the career civil service system from political abuses." U.S. General Accounting Office, *Report to the Congress* (May 13, 1980), https://www.gao.gov/assets/fpcd-80-38.pdf. The statute also replaced

a "patchwork system" of outdated civil service laws with an "integrated scheme of administrative and judicial review." *United States v. Fausto*, 484 U.S. 439, 445 (1988).

As relevant here, the CSRA created two administrative bodies: (1) the MSPB, and (2) the Office of Special Counsel (OSC). *See* 5 U.S.C. §§ 1204, 1211. The "primary function" of the MSPB is to adjudicate certain "federal employee appeals of adverse actions." *Harris v. Bessent*, 775 F. Supp. 3d 164, 170 (D.D.C. 2025). The MSPB is a body of limited jurisdiction and may only hear "actions made appealable to it by law, rule or regulation." *Palmer v. Merit Sys. Prot. Bd.*, 550 F.3d 1380, 1382 (Fed. Cir. 2008); *see also* 5 U.S.C. § 7701(a). Adverse MSPB decisions may be appealed to the Federal Circuit, which has exclusive jurisdiction over those appeals. 28 U.S.C. § 1295(a)(9). Importantly, for the Federal Circuit to review a decision by the MSPB, the MSPB must have had jurisdiction over the matter in the first place. *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1337 (Fed. Cir. 2020).

OSC, a separate administrative body, is charged with (among other things) receiving and investigating allegations of specifically enumerated "prohibited personnel practices." 5 U.S.C. §§ 1212, 1214, 2302. If the Special Counsel determines there are "reasonable grounds" to believe a prohibited personnel practice occurred, they may request that the MSPB take "corrective action." § 1214(b)(1)(A)(i), (b)(2)(B)–(C). After receiving such a request, the MSPB is obligated to order only "such corrective action as the Board considers appropriate." § 1214(b)(2)(4)(A).

The CSRA does not mention the Privacy Act. *See* 92 Stat. 1111 *et seq.*

**B. Factual Background**

Defendants in this case include several federal agencies that each maintained records about Plaintiffs in the lead up to their terminations: the Department of Commerce and its subcomponent NOAA, the U.S. Office of Personnel Management (OPM), the Office of Management and Budget (OMB), and the U.S. DOGE Service (DOGE). Compl. (ECF No. 1). As pleaded in the complaint,

shortly following President Trump's inauguration earlier this year, Defendants began a coordinated effort to terminate probationary employees at federal agencies across the government, including at NOAA, who were not meeting job performance expectations. *Id.* ¶¶ 33–45, 69, 72–77 103–10. Apparently motivated by a zealous desire to separate as many federal employees as quickly as possible, Defendants relied on inaccurate or incomplete records in erroneously determining that Plaintiffs and putative class members were, in fact, poor performers. *Id.* ¶¶ 11–12, 78, 111–17.

The effort to identify under-performing probationary employees at NOAA began with OPM. *Id.* ¶ 3. On inauguration day, OPM directed agencies, including NOAA, to send a report to OPM listing all probationary employees. *Id.* ¶ 33. The directive also emphasized the importance of using probationary periods to "assess employee performance." *Id.* By February, these employee records were regularly shared with OMB. *Id.* ¶ 43. DOGE also gained access to IT systems at NOAA and became involved in decisions about who to fire. *Id.* ¶¶ 57, 107–08. Throughout this process, OPM emphasized the importance of "individual employee performance" in determining which probationary employees should be let go. *See, e.g.*, *id.* ¶ 41. Commerce and NOAA sought to comply with these directives, firing hundreds (but not all) of their probationary employees. *Id.* ¶ 59. Terminated employees received notice via email that they were being fired for cause due to their poor performance, *id.*, and eventually SF-50 forms using codes that meant the same, *id.* ¶ 75.

The problem, however, was that the records to which these employees had access showed no sign of poor performance. The government tracks employee job performance, and Plaintiffs' ratings and feedback had been uniformly positive. *Id.* ¶¶ 48–49, 67–68, 82, 87, 93, 99. Given Defendants' stated poor-performance rationale, and Plaintiffs' contrasting positive reviews, Plaintiffs assert that the records used to fire them must have inaccurately or incompletely reflected their job performance. *Id.* ¶ 78. Had decisionmakers consulted accurate records, Plaintiffs would

not have been terminated for cause. *Id.* ¶ 126. Making matters worse, Commerce and NOAA also issued official government records—first the termination notices and later the SF-50s—that reflect the same flawed justification for the terminations. *Id.* ¶¶ 59, 75. As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered myriad harms associated with being incorrectly terminated for poor performance, including lost wages and benefits, diminished employment opportunities, reduced earning potential, treatment costs for mental and physical conditions, and job-search-related expenses. *Id.* ¶¶ 55, 83, 87, 95, 101.

Plaintiffs filed this putative class action lawsuit on June 30, 2025, asserting two claims under the Privacy Act. Count 1 alleges that Plaintiffs' terminations were caused by Defendants' failure to maintain their records with "accuracy, relevance, timeliness, and completeness," in violation of 5 U.S.C. § 552a(g)(1)(C). *Id.* ¶¶ 124–31. In Count 2, Plaintiffs contend that Defendants disseminated records without first undertaking reasonable efforts to assure their accuracy, in violation of § 552a(g)(1)(D) and (e)(6). *Id.* ¶¶ 132–42. Individually, and on behalf of a class, Plaintiffs seek actual damages and declaratory relief. *Id.* at 40.

## LEGAL STANDARDS

In considering Defendants' facial challenge under Rule 12(b)(1), "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Similarly, under Rule 12(b)(6), the Court must "accept as true all well-pleaded facts" and "construe them in the light most favorable to the plaintiff." *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017). A complaint need not include "detailed factual allegations," but "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a probability requirement." *Id.* (quotation marks omitted). Plaintiffs at this stage "may plead alternative, and even inconsistent, claims." *Pridgen v. Appen Butler Hill*, 2018 WL 1912213, at *2 (D. Md. Apr. 23, 2018).

## ARGUMENT

### I. Defendants' jurisdictional argument fails.

#### A. This Court should follow precedent holding that the CSRA does not preclude federal employees from bringing Privacy Act claims in federal court.

Defendants argue (Mem. 8–12) that Privacy Act claims based on terminations are entirely precluded by the CSRA. The Fourth Circuit has never addressed that question in a published opinion, and other circuits have reached different conclusions. The Ninth Circuit, for example, has held that virtually all Privacy Act claims concerning federal employment are precluded. *See Houlihan v. Off. of Pers. Mgmt.*, 909 F.2d 383, 385 (9th Cir. 1990). The D.C. Circuit, by contrast, has "taken a rather narrow view of CSRA preemption in Privacy Act cases." *Gerlich v. U.S. Dep't of Just.*, 659 F. Supp. 2d 1, 14 (D.D.C. 2009). In the absence of Fourth Circuit precedent, this Court should follow the D.C. Circuit's approach.

1. D.C. Circuit precedent squarely supports Plaintiffs' position. In *Hubbard v. EPA Administrator*, cited *passim* throughout Defendants' brief, the D.C. Circuit considered a Privacy Act claim brought by a federal job applicant who alleged that the record used to document his rejection was inaccurate. 809 F.2d 1 (D.C. Cir. 1986). After carefully considering the interplay between the Privacy Act and the CSRA, the court concluded that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record." *Id.* at 5. Six years later, *Kleiman v. Department of Energy*—also relied on

by Defendants—reaffirmed that holding, stating: "[N]othing we say today should be taken to cast doubt on *Hubbard*'s statement that 'the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action actually caused by an inaccurate or incomplete record.'" 956 F.2d 335, 339 n.5 (D.C. Cir. 1992) (quoting *Hubbard*, 809 F.2d at 5) (emphasis omitted).

Despite their reliance on *Hubbard* and *Kleiman*, Defendants ignore the holdings in each case that federal courts have jurisdiction to hear Privacy Act challenges to adverse personnel actions. Although both cases ultimately rejected Privacy Act claims, they did so because each plaintiff had failed to make out a necessary factual element—not because the courts lacked jurisdiction under the CSRA. *See Hubbard*, 809 F.2d at 5 (causation); *Kleiman*, 956 F.2d at 338 (inaccuracy). *Hubbard* emphasized the merits-based nature of its analysis, explaining that the plaintiff there "simply did not provide enough factual material on this issue." 809 F.2d at 6. And *Kleiman* put an even finer point on it, specifically "disagree[ing] . . . with the district court's conclusion" that it "lacked jurisdiction over the action." 956 F.2d at 339. Relying on this authority, even DOJ has recognized outside of court that "the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act claim for damages." *See* DOJ Overview, https://perma.cc/W9G2-BFB7.

To be sure, *Hubbard* and *Kleiman* recognize factual limits on Privacy Act claims in the federal employment context. As those cases make clear, the proper way "to accommodate the two statutory schemes" is to ensure that the Privacy Act is not given sweeping breadth. *Hubbard*, 809 F.2d at 5. *Hubbard* did so by interpreting causation under the Privacy Act to require a direct "causal link" between the records at issue and the adverse determination. *Id.* And *Kleiman* understood the accuracy prong to address "factual or historical errors," not "judgments of federal officials" reflected in agencies' records. 956 F.2d at 337–38 (emphasis omitted). These factual limitations—not a rule of categorical preclusion—are how courts "read the Privacy Act without doing violence

to the [CSRA]." *Id.* at 338. And those objections are properly addressed based on an examination of the underlying facts, not as a threshold jurisdictional matter. *Id.* at 339.

Consistent with this authority, the D.C. Circuit has at least twice ruled in favor of federal employees asserting Privacy Act claims, without any reference to jurisdictional difficulties under the CSRA. *See Gerlich v. U.S. Dep't of Just.*, 711 F.3d 161, 173 (D.C. Cir. 2013); *McCready v. Nicholson*, 465 F.3d 1, 4 (D.C. Cir. 2006). And district courts have faithfully applied *Hubbard* by considering employees' Privacy Act claims on the merits and allowing claims to proceed where plaintiffs carried their factual burden.[2]

2. There is good reason to follow the D.C. Circuit's approach. The Privacy Act's venue provision allows all Privacy Act suits to be brought in the District of Columbia. 5 U.S.C. § 552a(g)(5). That provision, combined with the concentration of federal agencies in the nation's capital, has led to a significant volume of Privacy Act cases brought in D.C. federal court. DOJ is accordingly of the view that "D.C. Circuit decisions carry great weight in Privacy Act matters." DOJ Overview, https://perma.cc/W9G2-BFB7. Defendants seem to agree; their brief cites no fewer than 27 cases from the D.C. Circuit or D.D.C.

Persuasive authority from this circuit is also consistent with D.C. Circuit precedent. In *Wirth v. Social Security Administration*, the Fourth Circuit considered a federal employee's claims challenging his demotion under the Privacy Act. 865 F.2d 1262 (4th Cir. 1988) (unpublished). The employee had alleged "that his personnel file contained inaccurate, incomplete, and untimely

[2] *See, e.g.*, *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 14–15 (D.D.C. 2018); *Ashbourne v. Hansberry*, 2015 WL 11303198, at *6 (D.D.C. Nov. 24, 2015), *aff'd*, 703 F. App'x 3 (D.C. Cir. 2017); *Feldman v. CIA*, 797 F. Supp. 2d 29, 45 (D.D.C. 2011); *Gerlich*, 659 F. Supp. 2d at 15; *Peter B. v. CIA*, 620 F. Supp. 2d 58, 77 (D.D.C. 2009); *Greenhouse v. Geren*, 574 F. Supp. 2d 57, 68–69 (D.D.C. 2008); *Lee v. Geren*, 480 F. Supp. 2d 198, 206 (D.D.C. 2007); *Doe P v. Goss*, 2007 WL 106523, at *9–10 (D.D.C. Jan. 12, 2007); Minute Entry, *Strzok v. Barr*, No. 1:19-cv-02367 (D.D.C. Sept. 25, 2020).

records." *Id.* The court held that, under the CSRA, the district court "lacked jurisdiction" to consider the employee's "claim for reinstatement with back pay." *Id.* As to the employee's claim for "damages under the Privacy Act," however, the court did not reach the same conclusion. *Id.* Instead, the court proceeded to consider the damages claim on the merits, ultimately concluding that the employee had failed to establish any "harm from the records." *Id.* In its analysis, the Fourth Circuit specifically cited and relied on the D.C. Circuit's decision in *Hubbard*. *Id.* Courts in this circuit have similarly evaluated Privacy Act claims brought by federal employees on the merits—which would be impermissible if courts were obligated to reflexively dismiss those claims for lack of jurisdiction, as Defendants insist.[3]

**B. The statutory text does not support preclusion under Supreme Court precedent.**

The D.C. Circuit's approach to accommodating the Privacy Act and the CSRA is also most consistent with the text of both statutes and recent Supreme Court precedent emphasizing the importance of seeking harmony when multiple statutes overlap. As a matter of statutory interpretation, a party arguing that one statute displaces another "faces a stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). "When confronted with two Acts of Congress allegedly touching on the same topic," the Supreme Court explained in *Epic Systems*, courts are "not at liberty to pick and choose among congressional enactments" and "must instead strive to give effect to both." *Id.* (quotation marks omitted). Defendants' authorities not involving separate legislative enactments are a poor fit for this case.

[3] *See, e.g.*, *Hogan v. England*, 159 F. App'x 534, 537 (4th Cir. 2005) (reviewing employee's Privacy Act claims on the merits following summary judgment); *Reinbold v. Evers*, 187 F.3d 348, 361 (4th Cir. 1999) (similar); *Lewis v. Dep't of the Treasury*, 2021 WL 4290635, at *6 (D. Md. Sept. 21, 2021) (acknowledging that former employee may be able to assert claims Privacy Act claims by pleading additional facts); *Lamb v. Modly*, 2021 WL 1198158, at *12 (D. Md. Mar. 30, 2021) (considering former employee's Privacy Act claims on the merits at summary judgment); *Anderson v. Daley*, 2000 WL 34551398, at *4 (E.D. Va. Apr. 26, 2000) ("Such activity, if it occurred, may create a cognizable claim under 5 U.S.C. § 552a."), *aff'd*, 24 F. App'x 103 (4th Cir. 2000).

1. The Supreme Court's decision in *Elgin v. Department of the Treasury* does not control here. 567 U.S. 1 (2012). In *Elgin*, former federal employees who had been fired for failing to register for the military draft sued to challenge the constitutionality of the draft's registration requirement. *Id*. at 6–7. The former employees sought "equitable relief," including "reinstatement to their former positions, backpay, benefits, and attorney's fees." *Id.* at 7–8. The Supreme Court held that the plaintiffs could not proceed in district court because the CSRA's remedial scheme provides "the exclusive means of review for constitutional claims." *Id.* at 8. *Elgin* has little to do with this case for three reasons.

*First*, Plaintiffs here do not assert standalone constitutional claims, nor do they seek reinstatement or equitable relief of any kind, *see* Compl. 40. Instead, Plaintiffs' claims arise under the Privacy Act—a separate legislative enactment that created causes of action and expressly vested district courts with jurisdiction. *See* 5 U.S.C. § 552a(g)(1) ("[T]he district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."). This type of "express" jurisdictional grant is "significant" to the preclusion analysis, because "when Congress wants to preserve remedies outside the CSRA, it does so expressly." *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 176–77 (D.C. Cir. 2013) (cleaned up) (holding that TSA review statute with express grant of jurisdiction was not precluded by the CSRA).

*Second*, unlike in *Elgin*, applying the CSRA here would not "merely direct[]" that Plaintiffs bring their claims elsewhere: it would "foreclose all judicial review" because district courts are the only place those claims may proceed. 567 U.S. at 10. In the Privacy Act, Congress vested federal district courts with exclusive jurisdiction, meaning other bodies lack authority to adjudicate Privacy Act claims. As the Federal Circuit has explained, "the Privacy Act . . . does not provide a basis for [MSPB] jurisdiction" because "claims under the Privacy Act must be brought in federal

district court." *Carell*, 131 F. App'x at 299; *see also Cofield v. United States*, 64 F. Supp. 3d 206, 214 (D.D.C. 2014) ("The federal courts . . . have exclusive jurisdiction over any claim Plaintiff may be asserting under . . . the Privacy Act."). On this point, even DOJ agrees. *See* DOJ Overview, https://perma.cc/W9G2-BFB7 ("[N]either the Merit Systems Protection Board nor the U.S. Tax Court has jurisdiction over Privacy Act claims."). For Plaintiffs, then, CSRA preclusion is not about whether their Privacy Act claims should merely be channeled to another forum. The question instead is whether those claims may be heard *at all*.

Defendants' appeal (Mem. 10–12) to *United States v. Fausto*, 484 U.S. 439 (1988), is misplaced. In that case, the Court held that Congress's decision in the CSRA to deny appeal rights to a certain type of federal employee meant that employee could not challenge adverse employment actions by bringing claims in federal court. *Id.* at 455. That outcome followed from the Court's determination that the CSRA reflected "a considered congressional judgment" to "deliberate[ly] exclu[de]" the relevant group of employees from "the provisions establishing administrative and judicial review" of agency personnel actions. *Id.* at 448, 455. Here, by contrast, administrative review is unavailable to Plaintiffs because *the Privacy Act* vests federal district courts with exclusive jurisdiction to hear claims brought under that statute. *See* 5 U.S.C. § 552a(g)(1). Defendants offer no evidence suggesting that Congress made a considered judgment in the CSRA (or anywhere else) to foreclose all review of Privacy Act claims. Accordingly, unlike *Fausto*, this is not a case where the CSRA "itself forecloses review." Mem. 10.[4]

*Third*, any suggestion that the Supreme Court's CSRA cases stand for a broader rule that federal workers may not bring *any* claims in federal court is wrong. Earlier this year, the D.C.

---

[4] The language Defendants quote (Mem. 5–6) from *NTEU v. Vought*, 149 F.4th 762, 775 (D.C. Cir. 2025), is not on point for the same reason. That decision is also subject to a pending *en banc* petition. *See* Order, No. 25-5091 (D.C. Cir. Oct. 6, 2025) (calling for response to petition).

Circuit rejected this kind of "categorical preclusion rule" under the CSRA. *Lucas v. AFGE*, 151 F.4th 370, 385 (D.C. Cir. 2025). In *Lucas*, the court examined decades of precedent and concluded that "a variety of statute-specific considerations" should "inform [the] analysis of the CSRA's preclusive effect," including "the breadth of the statute under which the employee seeks relief, the statute's text, and the timing of its enactment." *Id.* Applying these factors, the court distinguished between two types of laws. On one side of the line, claims under "general, catchall statutes" like the Administrative Procedure Act are precluded because those claims "could cover a vast number of cases that Congress intended to funnel through the CSRA's process." *Id.* at 384 (quotation marks omitted). On the other, claims under more "specific" statutes, like Title VII and the Americans with Disabilities Act, may proceed in federal court because those statutes do not suffer from such a "defect of generality." *Id.* at 385. The text and structure of the Privacy Act—including the "detailed instructions" it gives agencies "for managing their records," *Chao*, 540 U.S. at 618—make clear that the statute falls on the "specific," non-precluded side of the line.

2. The method of statutory interpretation the Supreme Court recently outlined in *Epic Systems* supports Plaintiffs' position. That approach "aim[s] for harmony over conflict" when construing overlapping statutes, out of recognition that "it's the job of Congress by legislation, not th[e] [courts] by supposition, both to write the laws and to repeal them." 584 U.S. at 511.[5]

a. With respect to the CSRA and the Privacy Act, Defendants cannot show "an irreconcilable statutory conflict" that would require choosing one law over the other. *Id.* Beginning with the text, there is no conflict on the face of the two statutes. Neither the Privacy

[5] The Supreme Court has never considered the interaction between the Privacy Act and the CSRA. But the Court has followed an approach in line with *Epic Systems* when interpreting these statutes separately. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (Privacy Act); *Fausto*, 484 U.S. at 453 (discussing "repeals by implication" under CSRA).

Act nor the CSRA explicitly limit Privacy Act claims for federal employees, and Defendants do not argue otherwise. *See Hubbard*, 809 F.2d at 12 (Wald, C.J., concurring in the judgment) ("[n]othing in the wording or legislative history of either Act suggests" "a potential conflict").

Nor is there any conflict in application. Each law has "its own scope and purpose" and "impose[s] different requirements and protections." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115 (2014). None of the enumerated "prohibited personnel practices" or "merit-system principles" in the CSRA address recordkeeping about employees in any amount of detail. 5 U.S.C. §§ 2301, 2302. And without "some comparably specific guidance," *Epic Sys.*, 584 U.S. at 513, it is unclear how an administrative body under the CSRA—which lacks jurisdiction in any case—would approach records-related issues covered by the Privacy Act. The two statutes also provide different remedies to achieve their different objectives: under the CSRA, employees may be reinstated and awarded back pay, 5 U.S.C. §§ 1204(a)(2), 5596(b); while the Privacy Act allows individuals to recover "actual damages" for harms they suffer from the government's improper use of their records, § 552a(g)(4)(A). Though Defendants may argue that differences in review process are a source of tension, varying enforcement mechanisms are common among federal regulatory regimes and do not bring statutes into conflict. *See Epic Sys.*, 584 U.S. at 502 (no conflict where one statute enforced agreements to arbitrate individually while the other permitted class or collective proceedings); *POM Wonderful*, 573 U.S. at 115 (no conflict where one statute provided for administrative enforcement while the other allowed for claims in federal court).

The peaceful coexistence of the CSRA and the Privacy Act for nearly 50 years is thus "quite consistent with the congressional design to enact two different statutes, each with its own mechanisms" to achieve Congress's goals. *POM Wonderful*, 573 U.S. at 116.

b. Even if Defendants could show some kind of conflict, which they cannot, courts

are bound by "the strong presumption" that "repeals by implication are disfavored." *Epic Sys.*, 584 U.S. at 510 (cleaned up). This presumption is based on the understanding that "Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (cleaned up). Here, the text of the Privacy Act plainly encompasses federal employees as "individual[s]" for whom Defendants "maintain any record." 5 U.S.C. § 552a(g)(1)(C), (a)(2)–(4). The CSRA—passed after the Privacy Act—is entirely silent on the earlier law. And when the Privacy Act was amended *after* the CSRA, Congress added extra protections for "Federal personnel" and the use of "Federal personnel or payroll systems," § 552a(a)(8)(A)(ii), (a)(8)(B)(v), (o)(1)(D)(ii), confirming that federal employees have been covered all along.

Defendants cannot show that Congress intended the CSRA to repeal the Privacy Act as to federal workers without so much as saying so. In *Fausto*, the Supreme Court made clear that the presumption against implied repeal applies to the CSRA just like any other statute. 484 U.S. at 453. Although the claims in that case were held to be precluded, the Court distinguished between revising prior judicial interpretations—which may be done by implication—and repealing express statutory text—which may not. *Id.* at 453–454. "[I]t can be strongly presumed," the Court reiterated, "that Congress will specifically address language on the statute books that it wishes to change." *Id.* at 453. To suggest that the CSRA extinguished federal workers' claims under the Privacy Act by failing to expressly reauthorize them would turn this presumption on its head.

c. The Supreme Court's approach to interpreting multiple statutes flows from a fundamental "respect for the separation of powers." *Epic Sys.*, 584 U.S. at 511. "Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*." *Id.* Where, as here, "two statutes complement each other," it would "show disregard for the congressional design to hold that

Congress nonetheless intended one federal statute to preclude the operation of the other." *POM Wonderful*, 573 U.S. at 115.

**C. To the extent relevant, the *Thunder Basin* framework favors Plaintiffs.**

Although Plaintiffs do not believe it applies here, the framework articulated by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 207 (1994), would also allow their claims to proceed. Courts use the *Thunder Basin* test to evaluate whether a particular claim "fit[s] within a statutory review scheme" like the CSRA. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). "That framework is typically applied to determine where a claim should first be brought," not whether "a statutory review scheme completely extinguishes a plaintiff's rights under another federal statute," as is the case here. *Lucas*, 151 F.4th at 386.[6] In any event, Plaintiffs' claims would be permitted to proceed at both steps of this framework.

1. First, Congress's intent to preclude district court review is not "fairly discernible" in the CSRA's "statutory scheme," *Thunder Basin*, 510 U.S. at 207, for reasons already discussed. Because the Privacy Act and the CSRA "can easily [be] read . . . to work in harmony," *Epic Sys.*, 584 U.S. at 525, it is not "fairly discernible" that the CSRA intended to divest district courts' jurisdiction to hear Privacy Act claims. *See supra* at 14–16.

Plaintiffs' claims also survive Defendants' motion to dismiss on this prong for another reason: the Fourth Circuit recently held that, even where Congress's intent to preclude district court review may have been "fairly discernible" at one point in time, that conclusion may no longer be true if the CSRA is not "function[ing] as Congress intended." *Nat'l Ass'n of Immigr. Judges v.*

[6] The *Thunder Basin* framework is less helpful in this case for the additional reason that the Privacy Act creates its own remedial scheme, so it is not clear which remedial scheme should preclude the other. The government has relied on this feature of the Privacy Act when advantageous to preclude the application of other laws. *See* Defs.' Br. (ECF No. 65) at 12, *Alliance for Retired Ams. v. Bessent*, No. 1:25-cv-00313 (D.D.C. May 5, 2025) ("the Privacy Act . . . sets forth a comprehensive remedial scheme, akin to . . . the [CSRA]" (quotation marks omitted)).

*Owen*, 139 F.4th 293, 304 (4th Cir. 2025) (*NAIJ*), *pet. for reh'g en banc filed* (Aug. 18, 2025). The court specifically took notice that recent actions by the Administration have "raise[d] serious questions as to whether the CSRA's adjudicatory scheme continues to function as intended," *id.* at 305, including that "[t]he Special Counsel and several members of the MSPB have been terminated by the President," and the government "has questioned the constitutionality of the removal protections enshrined in the CSRA," *id.* at 308. In light of these developments, the Fourth Circuit vacated and remanded for the district court "to conduct a factual inquiry whether the CSRA continues to provide a functional adjudicatory scheme." *Id.* Because these questions about the continued viability of the CSRA's review scheme "turn[] on a factual record," they may not be resolved against Plaintiffs at this early stage of the litigation. *Id.* at 305.

2. Plaintiffs similarly prevail at step two of the *Thunder Basin* framework, which looks to three factors to determine whether a claim is "of the type Congress intended to be reviewed within th[e] statutory structure." 510 U.S. at 212.

On the first factor, precluding Plaintiffs' claims would "foreclose all meaningful judicial review," *Axon*, 598 U.S. at 190, as discussed above, *supra* at 12–13. Defendants' passing suggestion to the contrary (Mem. 12 n.2) refers to a different cause of action, without any explanation for why that claim is relevant here or would not be subject to the same preclusion arguments. Second, Plaintiffs' records-related claims under the Privacy Act are "wholly collateral" to the CSRA's review provisions, *Axon*, 598 U.S. at 186, for similar reasons to why the two statutes are complementary and not in conflict, *supra* at 14–16. Third, the claim falls outside agency "expertise." *Axon*, 598 U.S. at 186. Even if Plaintiffs could raise their Privacy Act claims in administrative proceedings, OSC and MSPB have no special expertise regarding the government's record-management obligations. While those agencies may have "subject matter expertise" in

matters of federal employment, "Congress expects courts to handle technical statutory questions" like those underlying Plaintiffs' Privacy Act claims. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024). Accordingly, even if *Thunder Basin* were the right "frame of analysis in this case," Plaintiffs' claims would not be precluded. *Lucas*, 151 F.4th at 386.

**D. Although not required, the CSRA's review process has been exhausted.**

Setting these issues aside—including that neither OSC nor MSPB has jurisdiction to hear Plaintiffs' Privacy Act claims, *supra* at 4, 12–13—Plaintiffs could still bring their claims here even if they were required to pursue CSRA remedies first. As Defendants acknowledge (Mem. 5, 9), Plaintiffs have no appeal rights to the MSPB because of their probationary status.

While probationary employees may in some situations file a complaint alleging a prohibited personnel practice, OSC has already decided not to consider challenges to the Administration's purge of probationary employees, including Plaintiffs. Compl. ¶ 72. In denying probationary employees' claims, OSC explained that the firings were "more likely effected in accordance with the new administration's priorities than a decision personal to you." *Id.* Those denials are consistent with OSC's position that the probationary terminations earlier this year "do not constitute prohibited personnel practices in violation of 5 U.S. Code § 2302." *See* Mem. for OSC Personnel (Apr. 8, 2025), https://perma.cc/XV4P-GJVP. Thus, even if Defendants were right that Plaintiffs' claims are subject to the CSRA, that process has been exhausted by OSC's decision not to pursue any such claims—a decision that cannot be appealed. *See* 5 U.S.C. § 1214. Because there is no further review available under the CSRA, Plaintiffs' claims may be heard and adjudicated by this Court. *Accord Coleman v. Napolitano*, 65 F. Supp. 3d 99, 105 (D.D.C. 2014) ("[T]his Court has subject matter jurisdiction to hear the plaintiff's constitutional due process claim, which cannot be reviewed under the CSRA by the MS[PB] nor subsequently appealed to the Federal Circuit."); *Fleming v. Spencer*, 718 F. App'x 185, 188 n.2 (4th Cir. 2018) (suggesting

that OSC's discretionary review process may not deny judicial review altogether).

## II. Plaintiffs plausibly allege Privacy Act violations under Rule 12(b)(6).

### A. Plaintiffs plausibly allege a violation of 5 U.S.C. § 552a(g)(1)(C) (Count 1).

Turning to Defendants' Rule 12(b)(6) arguments, their effort to dismiss Count 1 stems largely from confusion about Plaintiffs' claims. Plaintiffs do not allege that their terminations were caused by Defendants' "reliance on their favorable performance evaluations." Mem. 15. And while Plaintiffs take issue with the *process* by which the SF-50s were disseminated, as discussed below (*infra* at 22–24), Plaintiffs do not allege that those records caused Plaintiffs' terminations, either. *See* Mem. 16. Instead, Plaintiffs allege that "the personnel files consulted by the decision maker were incomplete or inaccurate." Compl. ¶ 78. That these records remain within Defendants' exclusive control does not immunize them from liability under the Privacy Act.

Plaintiffs' theory underlying Count 1 follows from three well-pleaded facts. First, Plaintiffs were notified that they were being fired due to poor performance. *Id.* ¶¶ 59–60, 81, 86, 92, 98. Indeed, NOAA insisted on this poor-performance justification even as other agencies began using other bases for their layoffs. *Id.* ¶¶ 70, 75. Second, the personnel records to which Plaintiffs had access did not include any indication of poor performance. *Id.* ¶¶ 48–49, 64–68, 82, 87, 93, 99. Third, Defendants "did not conduct any new performance assessments." *Id.* ¶ 67. Taking these facts as true, it is a reasonable inference that Defendants' decisionmakers decided to terminate Plaintiffs based on records that inaccurately or incompletely reflected Plaintiffs' documented job performance. In other words, as Plaintiffs plead directly, "the personnel files consulted by the decision maker were incomplete or inaccurate, as they did not correctly reflect assessments of that employee's performance." *Id.* ¶ 78. There is nothing "circular" about it. Mem. 16.

Where, as here, plaintiffs challenge the accuracy of records "solely within the defendants' possession," they are not required "to plead much detail," and may rely on reasonable inferences

about the existence of the records and their lack of accuracy. *Peter B.*, 620 F. Supp. 2d at 75. Even so, Plaintiffs have identified at least one plausible candidate for the offending record: the "daily tracker" of probationary employees that NOAA and Commerce compiled and regularly sent to OPM and OMB. Compl. ¶ 43. Given Defendants' repeated emphasis on job performance—pleaded extensively in the complaint (*id.* ¶¶ 1, 33, 38, 41–45, 50–55, 69–77)—it is reasonable to infer that these trackers included inaccurate or incomplete records about Plaintiffs' performance. Relying on these flawed records, Defendants decided to terminate each Plaintiff, unquestionably an "adverse determination." *Id.* ¶ 126; *see* 5 U.S.C. § 552a(g)(1)(C).

Notably, Defendants offer no other explanation for the poor-performance justifications now emblazoned on Plaintiffs' records. Defendants take no issue with Plaintiffs' allegation that their performance reviews were universally positive. Nor do they contest that Plaintiffs' terminations were purportedly based on performance. Short of outright dishonesty, it is not clear how else agency decisionmakers could have reached the conclusion that Plaintiffs should be fired for cause based on poor performance. Indeed, even a simple policy decision to save money by firing as many probationary employees as possible would not explain specifically identifying poor performance as the reason. Inaccurate or incomplete records, on the other hand, plausibly explain the alleged facts. Nor is there any need for Plaintiffs to do more at this stage of proceedings, since "factual question[s]" of "proximate cause" are "typically not appropriate to discuss in a motion to dismiss." *DeRose for Est. of DeRose v. DoorDash, Inc.*, 675 F. Supp. 3d 591, 603 (E.D.N.C. 2023) (citation omitted); *see also Muhler Co. v. Ply Gem Holdings, Inc.*, 637 F. App'x 746, 748 (4th Cir. 2016).

Defendants also mischaracterize Plaintiffs' allegations regarding the Administration's animus toward federal workers (Mem. 15). As explained below (*infra* at 26–27), this animus is

relevant to Defendants' state of mind and why they would violate the Privacy Act intentionally or willfully. To the extent Defendants argue that Plaintiffs' terminations were not caused by records-related issues because they were caused by the Administration's hostility to federal workers instead, Defendants fail to show why these explanations are mutually exclusive. *See Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009) (injuries can have more than one cause).

Properly understood, Plaintiffs have plausibly alleged each element of a claim under 5 U.S.C. § 552a(g)(1)(C). *See Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996) (outlining elements). Defendants may well disagree with some of those facts, but a motion to dismiss may not be used "to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

**B. Plaintiffs plausibly allege a violation of 5 U.S.C. § 552a(e)(6) (Count 2).**

Defendants' arguments regarding Count 2 are similarly confused. Most significantly, Defendants treat Count 2 as an unlawful disclosure claim under 5 U.S.C. § 552a(b), when the claim Plaintiffs assert here is for unlawful dissemination under § 552a(e)(6). The former addresses when disclosure itself is prohibited; the latter addresses what steps an agency must take before an otherwise lawful disclosure—or, in the words of the statute, "prior to disseminati[on]," § 552a(e)(6). *See Bartel v. FAA*, 725 F.2d 1403, 1409 (D.C. Cir. 1984) (distinguishing between "nonconsensual disclosure of records" under subsection (b), and ensuring that a disclosure is "accurate and complete" under subsection (e)(6)); *Fleck v. Dep't of Veterans Affs. Off. of Inspector Gen.*, 596 F. Supp. 3d 24, 48 (D.D.C. 2022) ("[T]he claims in this case do not challenge the *release* of the OIG report but, rather, OIG's purported failure to ensure that the material contained in that report was accurate and complete prior to dissemination." (cleaned up)).[7]

---

[7] Defendants' cases (Mem. 18) hold no differently. Although *Akl v. Sebelius* involved disclosure to a third party, the substance of the (e)(6) claim allowed there was the same as here: the agency

To be clear, the complaint here raises an accuracy claim under § 552a(e)(6), *not* a disclosure claim under § 552a(b). Compl. ¶ 134. Plaintiffs do not argue, and need not allege, that the agencies should have kept Plaintiffs' termination records to themselves. Plaintiffs assert instead that the agency failed to undertake reasonable efforts to verify that their records were "accurate, complete, timely, and relevant" before disseminating those records to anyone, including Plaintiffs. *Id.* ¶ 137. This claim reflects a straightforward application of the statute's text, which requires agencies to take these reasonable efforts "prior to disseminating any record about an individual *to any person other than an agency*," with an exception for certain FOIA disclosures not relevant here. 5 U.S.C. § 552a(e)(6) (emphasis added). Plaintiffs are certainly persons, they are certainly not agencies, and the disseminations to Plaintiffs had nothing to do with FOIA. Contrary to Defendants' argument, it makes no difference that the agencies' disseminations were to Plaintiffs themselves. *See Fleck*, 596 F. Supp. 3d at 46–47 (declining to limit the plain language of (e)(6) because "[t]he Court cannot read into the Privacy Act what Congress did not place there").

Analyzed under the proper provision of the Privacy Act, Plaintiffs' complaint readily states a claim against Commerce and NOAA in Count 2. Under 5 U.S.C. § 552a(g)(1)(D), a plaintiff must establish that (1) the agency violated a provision of the Privacy Act, (2) the violation was intentional or willful, and (3) the violation had an adverse effect on the plaintiff. *See Paige v. DEA*, 665 F.3d 1355, 1358–59 (D.C. Cir. 2012). On the first element, Defendants violated § 552a(e)(6) by disseminating two records—first a termination notice, and then an SF-50—without taking reasonable steps to assure that the performance-based justification included in each was accurate.[8]

---

"failed to take reasonable efforts to ensure that the records . . . were accurate before disseminating them." 2011 WL 13273368, at *6 (D.D.C. Jan. 13, 2011). And the portion of *Feldman* discussed by Defendants did not address a claim under (e)(6) at all. 797 F. Supp. 2d at 38–39.

[8] It is true that Ms. Goodman had not yet received her inaccurate SF-50 at the time the complaint was filed. *See* Mem. 18. But Ms. Goodman had received a termination notice, which also qualifies

Compl. ¶¶ 135–37. Second, the violations were intentional or willful for the reasons described below. *Infra* at 26–27. And third, Plaintiffs plausibly allege adverse effects resulting from the inaccurate records because they must now "explain to prospective employers a formal for-cause termination and unfavorable determinations on their official government employment documents," resulting in "reduced earning potential and diminished employment opportunities" and harms to their "mental and physical health" caused by the associated stigma. Compl. ¶¶ 55, 83, 89, 95, 101.[9] Defendants' arguments regarding Count 2 should therefore be rejected.

## III. Defendants' remaining Rule 12(b)(6) arguments fail.

### A. Defendants' "collateral attack" argument repackages their factual challenges.

Defendants separately assert that Plaintiffs' claims must fail because they constitute an "impermissible collateral attack" on federal employment decisions. Mem. 12 (capitalization omitted). The broadest form of this argument—that no plaintiff can ever bring a Privacy Act claim based on a termination—fails for the same reason Defendants' jurisdictional arguments fail. Such an argument is contradicted by the many cases applying the Privacy Act directly to employment determinations by federal agencies. *Supra* at 8–11. Further, Plaintiffs' claims are not a "collateral attack," even in the colloquial sense. Plaintiffs do not seek reversal of Defendants' employment decisions in the form of reinstatement; they seek damages and declaratory relief for the unlawful way in which Defendants conducted their terminations. Compl. 40. The Fourth Circuit has recognized that this distinction between remedies makes a difference in this context, holding (albeit in an unpublished opinion) that an employee's Privacy Act claims "for reinstatement with

---

as a "record" under § 552a(a)(4) and is therefore sufficient to state a claim under Count 2. And the complaint alleges that other named Plaintiffs and putative class members had already received their SF-50s at the time of filing. Compl. ¶¶ 6, 75, 88, 94, 100.

[9] An "adverse effect" is broader than an "adverse determination" or "actual damages," and includes "nonpecuniary and nonphysical harm, such as mental distress, embarrassment, or emotional trauma." DOJ Overview, https://perma.cc/2HSP-EQAG (citing cases).

backpay" were foreclosed as an effort to "collaterally attack a personnel decision," while simultaneously reaching the merits of a Privacy Act claim for damages. *Wirth*, 865 F.2d at 1262.

Defendants, however, appear to be raising a different issue: whether Plaintiffs' claims impermissibly challenge "opinions or judgments" rather than "correction of facts." Mem. 12. This is another way that courts sometimes distinguish between proper Privacy Act claims (factual or historical errors) and improper collateral attacks (opinions or judgments). *See Kleiman*, 956 F.2d at 339 n.5; *Feldman*, 797 F. Supp. 2d at 47. But a claim is proper and may proceed under the Privacy Act "as long as the information contained in an agency's files is capable of being verified," in which case "the agency must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual." *McCready*, 465 F.3d at 19 (cleaned up).

Plaintiffs' documented history of meeting (or exceeding) job performance expectations is a matter of fact, not opinion. On this point, the D.C. Circuit's analysis in *McCready* is helpful. *Id.* at 1. The plaintiff in that case, an employee of the Department of Veterans Affairs, brought suit under the Privacy Act, alleging that the agency had denied her a bonus based on an Inspector General report that contained inaccurate information about her. *Id.* at 18–19. Although the report surely included judgments or opinions by the agency, the D.C. Circuit held that one of the contentions underlying the report—that the plaintiff did not work on a particular day—was a "fact capable of verification." *Id.* at 19. The court therefore reversed summary judgment in favor of the government and remanded for discovery on the issue. *Id.*

Here, the existence of Plaintiffs' uniformly positive performance reviews is just as discernable as an employee's attendance history in *McCready*. It is therefore readily verifiable whether the records relied on by Defendants accurately and completely reflected Plaintiffs' documented performance history. The question is not whether Plaintiffs were in fact good

performers, or whether Plaintiffs agreed with the conclusions their supervisors reached—questions that would involve subjective judgment. The verifiable error Plaintiffs challenge here is whether Defendants' records correctly reflected the positive evaluations Plaintiffs had previously received, a purely data-driven question, and whether the flawed performance-based justification now included in Plaintiffs' employment records relied on that verifiable error. Compl. ¶¶ 75, 78.

### B. Plaintiffs plausibly allege that Defendants' Privacy Act violations were "intentional or willful."

Defendants next argue that Plaintiffs' allegations are not sufficient to show that Defendants violated the Privacy Act in an "intentional or willful" way. Mem. 19. At the outset, intent is a notoriously fact-specific question. *See Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) ("[I]dentifying the government's intent in this case raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion."). And "[f]act-specific questions cannot be resolved on the pleadings." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).

While Plaintiffs agree that "intentional or willful" as used in the Privacy Act are terms of art (Mem. 19), the standard is not as demanding as Defendants suggest. "Intentional or willful" in this context means: "somewhat greater than gross negligence, or, an act committed without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010) (emphasis omitted); *see also Scrimgeour v. Internal Revenue*, 149 F.3d 318, 326 (4th Cir. 1998). Here, Plaintiffs have alleged enough facts to support such an inference, especially at this early stage of proceedings.

Defendants' arguments to the contrary rest largely on a perceived "contradiction" between the allegations that Defendants "relied on inaccurate personnel records" to fire Plaintiffs and the current Administration's "concerted effort to reduce the federal workforce." Mem. 19–20. But these contentions reinforce each other. The concerted effort to fire probationary workers by any

means necessary (Compl. ¶¶ 33–54), combined with vitriolic animus toward federal workers (*id.* ¶¶ 111–16), motivated Defendants to cut corners by intentionally or willfully relying on flawed records. Plaintiffs also specifically allege that Defendants acted with "a consciousness of wrongdoing" by working to "minimize paper trails." *Id.* ¶ 117; *see Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 347 (D.D.C. 2018) (intent plausible where plaintiff alleged that defendants "intentionally and deliberately fail[ed] to verify facts").

The nature of the alleged violations also supports an inference of conscious disregard for the law. That there was not a "shred of support" for these performance-based terminations (Compl. ¶¶ 12, 68), reveals how obviously inaccurate the records used by Defendants were, and, in turn, the strong likelihood that Defendants acted in a way that "flagrantly disregard[ed]" Plaintiffs' rights under the Privacy Act. *Maydak*, 630 F.3d at 179. And the breakneck pace with which these terminations were carried out demonstrates something far greater than gross negligence: Defendants purported to identify and terminate thousands of poor performers across the government in less than six weeks (Compl. ¶¶ 33–52, 59), a herculean bureaucratic task even in the best of circumstances. Taken together, the "totality" of the facts in the complaint "adequately allege intentional or willful conduct." *Feldman*, 797 F. Supp. 2d at 42.

Defendants' back-up arguments (Mem. 20)—that Defendants could not have acted intentionally because they never substantially relied on inaccurate information, and disclosed Plaintiffs' SF-50s only to Plaintiffs—merely rehash their other merits arguments. For reasons discussed elsewhere, the Court should reject Defendants' argument that they could not have *intentionally* violated the Privacy Act because they did not violate the Privacy Act at all.

**C. Plaintiffs plausibly allege compensable damages.**

"Clearly, the loss of employment creates at least some pecuniary harm." *Lombrano v. Dep't of the Air Force*, 2022 WL 392308, at *6 (D.D.C. Feb. 9, 2022). Defendants nevertheless fight

this obvious conclusion. *See* Mem. 21–22. These arguments fail for three reasons.

*First*, damages are not an element of a Privacy Act violation, as the Fourth Circuit has squarely held. In *Doe v. Chao*, the court rejected the argument that "relief is part of the underlying cause of action" in the Privacy Act. 435 F.3d 492, 499 (4th Cir. 2006). That argument, the court explained, betrays a "misunderstanding over the difference between a cause of action and the relief afforded under it." *Id.* at 501. To be sure, demonstrating pecuniary harm is necessary to recover damages. *Id.* at 493. But even without proving damages, Plaintiffs may be entitled to other relief, including declaratory judgment and attorneys' fees. *Id.* (attorneys' fees); *Morinville v. U.S. Pat. & Trademark Off.*, 442 F. Supp. 3d 286, 295 (D.D.C. 2020) (declaratory relief). Defendants' arguments are thus more properly directed at the remedy phase.

*Second*, Defendants entirely ignore Count 1, which alleges that Defendants' failure to maintain accurate records "caused them to terminate Plaintiffs' employment . . . which was an adverse determination." Compl. ¶ 126. It follows that actual damages are those damages arising *from the adverse determination*, including what Defendants themselves characterize as "the natural consequences from losing a job and trying to start a new one." Mem. 21. Lost wages plainly qualify as "pecuniary." *See, e.g.*, *Stewart v. Kendall*, 578 F. Supp. 3d 18, 24 (D.D.C. 2022).

*Third*, despite Defendants' arguments to the contrary (Mem. 22), impairment of future job opportunities is pecuniary harm redressable by the Privacy Act. *See Hill v. U.S. Dep't of Def.*, 70 F. Supp. 3d 17, 22 (D.D.C. 2014) (holding lost "employment opportunities" compensable); *Makowski v. United States*, 27 F. Supp. 3d 901, 914 (N.D. Ill. 2014) ("Loss of economic opportunity is pecuniary harm."); *Speaker v. HHS CDC*, 623 F.3d 1371, 1383 (11th Cir. 2010) (holding "loss of prospective clients as an attorney" compensable). Plaintiffs' allegations rise above mere "reputational harm" by alleging that Defendants' conduct has caused "reduced earning

potential and diminished employment opportunities" (*see, e.g.*, Compl. ¶ 83), which have quantifiable monetary value. Nor are these claims conclusory (*see* Mem. 22). As alleged in the complaint, Defendants' conduct has forced Plaintiffs "to explain to prospective employers a formal for-cause termination and unfavorable determination on their official government employment documents." Compl. ¶ 55.[10] At this early stage, it is more than reasonable to infer that being fired for cause and having that determination memorialized on official government records will negatively affect future employment prospects.

**D. All Defendants are properly named.**

In their motion (Mem. 23), Defendants seek to dismiss (1) individuals sued in their official capacities, and (2) OPM, OMB, and DOGE as to Count 1.[11] Both arguments lack merit.

*First*, when an agency official is sued in their official capacity, the official *becomes* the agency for purposes of litigation. As the Supreme Court has explained, public officers sued in their official capacity are not individual "persons" for purposes of suit because "they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991). That holds true in Privacy Act cases. *See Jarrell v. Tisch*, 656 F. Supp. 237, 238 (D.D.C. 1987) ("The current Postmaster, sued in his official capacity as the legal embodiment of the Postal Service, would also be the appropriate defendant under the Privacy Act."). Because Plaintiffs have named individuals only in their official capacities (Compl. ¶¶ 18–27), Defendants' argument fails.

*Second*, Defendants ignore the allegations that OPM, OMB, and DOGE "maintain[ed]" records at issue in this litigation. The Privacy Act defines the term "maintain" broadly to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). As to OPM, Plaintiffs allege that

---

[10] While Defendants cherry-pick the word "may" from one sentence (Mem. 22), each Plaintiff alleges facing these harms without qualification. Compl. ¶¶ 83, 89, 95, 101.
[11] Count 2 is already limited to NOAA, Commerce, and their agency heads. Compl. ¶¶ 132–42.

the agency began collecting records about probationary employees as early as four days after inauguration. Compl. ¶ 33. These probationary employee "trackers" compiled detailed data about each employee. *Id.* ¶¶ 35–37, 42. The trackers were "roll[ed] up into a consolidated dashboard" and sent to OMB daily. *Id.* ¶ 43. As to DOGE, prior to the terminations, the agency "visited NOAA offices and gained access to the agency's IT systems" (*id.* ¶ 57), and DOGE had a heavy presence at OPM and Commerce (*id.* ¶¶ 105–08). "DOGE leads" were also involved in carrying out the terminations. *Id.* ¶ 36. These allegations plausibly allege that each Defendant "maintain[ed]" records at issue here. *Dickson v. OPM*, 828 F.2d 32, 33 (D.C. Cir. 1987).

**E. Defendants' remaining arguments are readily dispensed with.**

Defendants' arguments regarding Count 3 (Mem. 24–25) should be rejected. Because Count 1 and Count 2 state valid claims, there is no concern about the Declaratory Judgment Act claim remaining by itself. Nor is Count 3 duplicative of the Privacy Act claims. To the extent the Declaratory Judgment Act allows for different relief that is not available directly under the Privacy Act, Count 3 is necessary to fully redress Plaintiffs' harms. *See Morinville*, 442 F. Supp. 3d at 295.

As to the class allegations, the Court need not reach Defendants' arguments (Mem. 25–26) because the individual Plaintiffs have plausibly alleged viable claims.

Finally, any dismissal should not be "with prejudice" as Defendants have requested. Mem. 26. Dismissal on jurisdictional grounds must be "without prejudice," *Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022), and dismissal for failure to state a claim may be cured by additional allegations. Should the Court identify any pleading deficiencies, Plaintiffs request leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in full. Plaintiffs respectfully request oral argument.

Dated: October 17, 2025

Respectfully submitted,

*/s/ Clayton L. Bailey*

Clayton L. Bailey (Bar No. 31812)
Jessica Merry Samuels (Bar No. 31701)
**Civil Service Law Center LLP**
1325 G Street NW, Suite 500, PMB 801
Washington, DC 20005
(202) 571-7836
cbailey@civilservicellp.com

*Counsel for Plaintiffs*