Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHERINE JACKSON, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Human and Health Services, *et al.*,<br><br>Defendants. | Civil Action No. 25-1750 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

On April 1, 2025, the United States Department of Health and Human Services ("HHS") notified approximately ten thousand employees of their separation from the agency pursuant to a Department-wide reorganization and Reduction in Force ("RIF"). Seven terminated employees then initiated this putative class action against defendants HHS, three of HHS's component agencies—the Administration for Children and Families ("ACF"), the Food and Drug Administration ("FDA"), and the Centers for Disease Control and Prevention ("CDC")—as well as the Office of Management and Budget ("OMB"), the Office of Personnel Management ("OPM"), the U.S. DOGE Service and U.S. DOGE Service Temporary Organization (together, "DOGE"), and their respective officers in their official capacities. *See* Class Action Complaint ("Compl."), ECF No. 1. To support their claim for damages and declaratory relief, plaintiffs allege that defendants intentionally and willfully based the termination decisions as to plaintiffs on inaccurate personnel records, in violation of the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896. Defendants have moved to dismiss for lack of subject matter jurisdiction and failure to state

a claim, under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  For the reasons discussed below, defendants' motion is denied in part and granted in part.

## I.    BACKGROUND

Following a brief review of the statutory framework from which disputes concerning this lawsuit arises, the factual and procedural history of this case is summarized.

### A.    Legal Framework

#### 1.  *The Privacy Act of 1974*

In 1974, Congress passed the Privacy Act to "protect the privacy of individuals identified in information systems maintained by Federal agencies."  *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting Privacy Act of 1974, § 2(a)(5), 88 Stat. 1896).  To that end, the Act "regulates the collection, maintenance, use, and dissemination of information by such agencies," "giv[ing] agencies detailed instructions for managing their records and provid[ing] for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  *Id.*  As enforcement mechanisms, the Privacy Act provides four separate causes of action, *see* 5 U.S.C. § 552a(g)(1)(A)-(D), only two of which are relevant here, 5 U.S.C. § 552a(g)(1)(C) and (1)(D).

Under 5 U.S.C. § 552a(g)(1)(C), an "individual" may bring a claim whenever an agency "fails to maintain" an adequate record on an individual, resulting in a determination "adverse" to that person.  *See* 5 U.S.C. § 552a(g)(1)(C) (permitting "a civil action against the agency" whenever the agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual"); *see also* 5 U.S.C. § 552a(a)(2) ("[T]he term 'individual' means a citizen of the United

States or an alien lawfully admitted for permanent residence[.]").  To state a claim for relief under § 552a(g)(1)(C), an individual must establish that (1) he "has been aggrieved by an adverse determination"; (2) the agency "failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination"; (3) the agency's "reliance on the inaccurate records was the proximate cause of the adverse determination"; and (4) the agency "acted intentionally or willfully in failing to maintain accurate records."  *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).

Under 5 U.S.C. § 552a(g)(1)(D), known as the "catchall" provision, *Doe*, 540 U.S. at 618, a claim may be brought whenever an agency "fails to comply with any other provision of [the Privacy Act], or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual."  To state a claim for relief under § 552a(g)(1)(D), a plaintiff must establish that "(1) the agency violated a provision of the Privacy Act, (2) the violation was 'intentional or willful,' and (3) the violation had an 'adverse effect' on the plaintiff."  *Paige v. Drug Enf't Admin.*, 665 F.3d 1355, 1358-59 (D.C. Cir. 2012) (citation and alteration omitted).

In 1988, Congress amended the Privacy Act with the Computer Matching and Privacy Protection Act, Pub. L. No. 100-503, 102 Stat. 2507.  The Computer Matching and Privacy Protection Act was passed in the wake of an "explosive growth of computer matching at both Federal and State levels of government."  *Computer Matching and Privacy Protection Act: Hearing Before the Subcomm. on  Oversight of Government Management*, 99 Cong. 1 (Sept. 16, 1986) (Statement of Senator William S. Cohen, Chairman of Subcommittee).[1]  The bill's sponsor observed that agencies "routinely exchange[d] and cross check[ed] information from two or more

---

[1]    *See also Computer Matching and Privacy Protection Act: Hearing Before the Subcomm. on  Government Operations*, 100 Cong. 1 (Jun. 23 1987) (Statement of Representative Glenn English, Chairman of Subcommittee) ("The bill is primarily the work of Senator William Cohen who has diligently investigated computer matching over the last few years.").

data bases, most often to detect fraud, abuse, or overpayments in Government programs." The bill's sponsor explained that although "computer matching" can be "a useful, efficient tool to protect the integrity of Government programs," "[t]he subcommittee's investigation and past hearings have revealed tremendous potential for abuse in computer matching, because there [were] no mandatory rules for agencies to follow when performing matches, little protection for the person whose records [were] matched, and inadequate oversight of how these programs [were] being conducted," all of which resulted in individuals "hav[ing] crucial Government benefits reduced or terminated solely on the basis of unverified information produced by a computer match, information that [could have been] out-of-date, misleading or just plain wrong." *Id.* at 2. As the congressional member explained, "We must take care not to allow the blessing of technology to become transformed into a beast that will crush the cherished values of democracy." *Id.*

To that end, the Computer Matching and Privacy Protection Act added several new provisions—including 5 U.S.C. §§ 552a(o), (p), and (q)—which set restrictions on the use of "matching programs," defined as computerized comparisons of different systems of records. *Id.* § 552a(a)(8). Relevant here, subpart (o) prohibits federal agencies from disclosing records to other federal agencies, state governments, or local governments "for use in a computer matching program" without a written agreement detailing certain enumerated information. *Id.* § 552a(o)(1). Subpart (p) requires agencies, before taking any "adverse action" against an individual, to "independently verif[y]" the accuracy of information produced by a matching program, *id.* § 552a(p)(1)(A)(i), and to provide the individual with notice and the opportunity to contest the findings, *id.* § 552a(p)(1)(B). Finally, subpart (q) prohibits agencies, "[n]otwithstanding any other provision of law," from sharing records with other agencies for use in a matching program if the requirements of subparts (o) or (p) "are not being met." *Id.* § 552a(q)(1).

The Privacy Act limits jurisdiction over Privacy Act matters to the federal district courts. *Id.* § 552a(g)(1). Privacy Act claims thus cannot be brought in any administrative tribunals. *See Carell v. Merit Sys. Prot. Bd.*, 131 F. App'x 296, 299 (Fed. Cir. 2005) ("[T]he Privacy Act also does not provide a basis for [Merit Systems Protection] Board jurisdiction. . . . [C]laims under the Privacy Act must be brought in federal district court.").

### 2. *The Civil Service Reform Act of 1978*

Just four years after the passage of the Privacy Act, Congress enacted the Civil Service Reform Act of 1978 ("CSRA") "to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service." Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (Oct. 13, 1978). The Civil Service Act, first passed in 1883 and later amended, "was precipitated by public disapproval of the 'spoils system'" that governed the federal bureaucracy of the 19th century. *Nat'l Treasury Emps. Union v. U.S. Merit Sys. Prot. Bd.*, 743 F.2d 895, 900 n.1 (D.C. Cir. 1984). Under the "spoils system", "the President could dispense federal jobs as rewards for political patronage," *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 153 (D.C. Cir. 1982), which "resulted in wholesale turnovers of personnel in many parts of the government after every election defeat," *Nat'l Treasury Emps. Union*, 743 F.2d at 900 n.1. Seeking in part to "limit political pressures on jobholders," *id.*, the CSRA replaced the "spoils system" with a "merit system" that would instead "base selection and promotion of most civil servants on competence," *Frazier*, 672 F.2d at 153.

Among other things, the CSRA governs "personnel action taken against members of the civil service." *United States v. Fausto*, 484 U.S. 439, 446-47 (1988). "Three main sections of the CSRA govern personnel action taken against members of the civil service." *Id.* at 445. One section deals with "unacceptable job performance," *id.* at 445-46 (citing 5 U.S.C. § 4301); another section speaks to employee "misconduct," *id.* at 446-47 (citing 5 U.S.C. § 7501 *et seq.*); and the third

section "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers," *id.* at 446 (citing 5 U.S.C. §§ 2301, 2302).

Under the CRSA, employees wishing to challenge an adverse personnel action may bring their claims before the CSRA's administrative tribunal, the Merit Systems Protection Board ("MSPB"). Final MSPB decisions may then be appealed to the Federal Circuit, which has exclusive jurisdiction over those appeals. 28 U.S.C. § 1295(a)(9). Importantly, judicial review before the Federal Circuit is available only when the MSPB has original jurisdiction over the claim. *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1338 (Fed. Cir. 2020) ("[T]he CSRA channels judicial review of an adverse action exclusively through the Federal Circuit only if it first channels review through the Board."). Notably, the CSRA does not mention the Privacy Act.

## B.    Factual Background

The relevant facts, as alleged by plaintiffs and recounted in the Complaint, are set out next. *See Casey v. McDonald's Corp.*, 880 F.3d 564, 567 (D.C. Cir. 2018) ("On a motion to dismiss, we must assume that the allegations of the complaint are true.").

On March 27, 2025, HHS announced formal plans to terminate "about 10,000 full-time employees," to "consolidate" the 28 divisions of HHS into 15, and to reduce regional offices from 10 to 5. Compl. ¶ 42.[2] HHS's plans were initially delayed by a few days, "reportedly due to infighting at DOGE and concerns about the reliability of the relevant data" and, according to some news reports, to "triple check[]" all the data "over the weekend." *Id.* ¶ 43.

On April 1, 2025, just five days after the public announcement, and "[d]espite the agency's awareness of systemic errors in the underlying personnel records," HHS implemented the cuts. *Id.*

---

[2]    Compl. ¶ 42 (citing HHS Announces Transformation to Make America Healthy Again, U.S. Dep't of Health and Hum Servs. (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html).

¶ 44.  Thousands of employees received email notices that they were placed on administrative leave, effective immediately, with formal separations effective on June 2, 2025.  *Id.* ¶ 45. According to plaintiffs, the RIF notices attached to the emails contained "obviously inaccurate personnel records."  *Id.* ¶ 48.  For example, one common error across HHS was the use of inaccurate performance ratings.  *Id.* ¶ 49 (explaining that employees are rated from 1 (Achieved Unsatisfactory Results) to 5 (Achieved Outstanding Results), but "the scores listed were often inaccurate").  Another "consistent" error in the RIF notices related to the "competitive area," which in the context of a RIF is "an organizational and geographic subdivision within an agency" within which "[e]mployees compete for retention."  *Id.* ¶ 50.  The "competitive level," which "would group together comparable employees of a certain position within a competitive area" for retention purposes, also reflected inaccurate or incomplete records.  *Id.* ¶ 51.

Plaintiffs allege that "[t]he inaccurate and incomplete records reflected in the RIF notices caused Plaintiffs' terminations in at least two ways."  *Id.* ¶ 53.  First, plaintiffs allege that "these unreliable records hopelessly marred the image of various HHS offices and subcomponents that were being considered by Defendants for significant cuts, making entire offices more likely to be targeted by DOGE and others for elimination."  *Id.*  Second, "these inaccurate and incomplete records fed directly into agency retention registers—the formal standings that rank employees against each other—making it less likely that Plaintiffs caught up in the RIF would be retained or offered favorable reassignment."  *Id.*

Each of seven named individual plaintiffs of this putative class action allege receiving a RIF notice that reflected at least one factual error in the personnel records used to terminate them. All seven received RIF Notices that reflected inaccurate, lower performance ratings than their actual ratings.  *Id.* ¶¶ 111, 115, 119, 124, 128, 131, 134.  Plaintiffs believe their inaccurate

performance ratings contributed to their terminations, noting that "[t]he Trump Administration has consistently insisted that performance is an important and decisive factor in its approach to cutting the federal government."  *Id.* ¶ 54; *see also id.* (quoting the President: "It's very important that we cut levels down to where they should be, but it's also important to keep the best and most productive people.")[3]; *id.* (quoting memorandum from OPM and OMB directing agency heads to prioritize, *inter alia*, "[r]emoving underperforming employees")[4]; *id.* ¶ 55 (quoting memorandum from OPM directing agency heads to send a report listing "all employees who received less than a 'fully successful' performance rating in the past three years").[5]  Plaintiffs also point out that performance is one of four factors among which impacted employees are ranked in determining retention during a RIF.  *Id.* ¶ 57 (citing OPM Website discussing 5 U.S.C. §§ 3501-3503 and 5 C.F.R. part 351).

In addition to inaccurate performance ratings, five of the seven individual plaintiffs also alleged receiving RIF notices reflecting inaccurate or incomplete "competitive areas."  *Id.* ¶¶ 112, 116, 120, 125, 128.  Plaintiffs believe the inaccurately listed competitive areas "swept employees into the RIF who should not have been," and caused errors in the retention registers.  *Id.* ¶¶ 64-65.

Plaintiffs allege that "the April 1 cuts were the result of a coordinated effort by the leaders of HHS, DOGE, OPM, and OMB."  *Id.* ¶ 136.  Plaintiffs' complaint recounts a lengthy back-and-forth throughout February and March 2025 during which OPM, OMB, and DOGE requested, received, and reviewed personnel records from HHS in connection with the anticipated cuts.  *See*

---

[3]     *Id.* ¶ 54 (quoting the President's social media post on March 6, 2025, 1:55 p.m., https://truthsocial.com/@realDonaldTrump/posts/114117008305421663).

[4]     *Id.* (quoting Mem. from Russell T. Vought, Dir., OMB, & Charles Ezell, Act. Dir., OPM, to Heads of Exec. Dep'ts & Agencies ("OMB & OPM Memo") (Feb. 26, 2025), https://perma.cc/ZLK2-FGTP).

[5]     *Id.* ¶ 55 (quoting Mem. from Charles Ezell, Act. Dir., OPM, to Heads and Act. Heads of Dep'ts and Agencies ("OPM Memo") (Fec. 6, 2025), https://perma.cc/VJ9L-Y9J3).

*id.* ¶¶ 84-100.  For instance, plaintiffs allege that, beginning shortly after the January 20, 2025,

inauguration, OPM directed federal agencies, including HHS, to provide certain data on employees

who received poor performance ratings in the last three years.  *Id.* ¶ 86.  HHS "sought to comply"

with this request and "dutifully collected" and "sent those records" as directed.  *Id.* ¶ 87.  Around

the same time, OPM and OMB also ordered agencies to prepare and submit "Agency RIF and

Reorganization Plans" for review, *id.* ¶ 88, which order HHS complied with by providing "granular

record data about their employees" for OMB and OPM to "review," *id.* ¶¶ 88, 90.  OMB and OPM

also directed agency heads to "collaborate with their Department of Government Efficiency

('DOGE') team leads within the agency in developing competitive areas" for the RIFs.  *Id.* ¶ 92.[6]

Plaintiffs allege that, as directed, HHS personnel met with DOGE representatives in late February

and early March, and DOGE representatives "request[ed] office-specific personnel data with very

little notice" and "comb[ed] through records . . . looking for people to fire."  *Id.* ¶¶ 94-95.

Plaintiffs' complaint further asserts that the new administration's new leaders of HHS,

OPM, OMB, and DOGE "have long shown antipathy toward the federal workforce," which

provides "support for the intentional nature" of the mistakes leading to the terminations.  *Id.* ¶ 136.

For instance, plaintiffs point to HHS Secretary Robert F. Kennedy's "tweet[]" about the FDA, a

component of HHS, shortly before the election: "FDA's war on public health is about to end. . . . If

you work for the FDA and are part of this corrupt system, I have two messages for you: 1. Preserve

your records, and 2. Pack your bags."  *Id.*[7]  Plaintiffs also quote Secretary Kennedy's public

statement about the National Institutes of Health ("NIH"), another component of HHS: "We need

---

[6]     *Id.* ¶ 92 (quoting OMB & OPM Memo, at 2).

[7]     *Id.* ¶ 138 (quoting HHS Secretary Kennedy's social media post on October 25, 2024, 5:25 p.m.,
https://perma.cc/V3D3-LCSH).

to act fast, and we want to have those people in place on Jan. 20 so that on Jan. 21, 600 people are going to walk into offices at NIH, and 600 people are going to leave." *Id.*[8]  Plaintiffs further emphasize the derogatory statements made by the new administration's new leaders of DOGE and OMB about the federal workforce. *See, e.g.*, *id.* ¶ 140 (quoting Elon Musk, "*de facto* leader of DOGE and a Special Government Employee," saying that, "Stalin, Mao, and Hitler didn't murder millions of people. Their public sector employees did.")[9]; *id.* ¶ 143 (quoting Russell Vought, OMB Director, saying, "We want the bureaucrats to be traumatically affected.").[10]

According to plaintiffs, the April Fools' Day personnel cuts were not a foolish blunder by a new administration.  Instead, "Secretary Kennedy went so far as to concede that the mistakes made by the agency were planned and purposeful: 'Personnel that should not have been cut, were cut. We're reinstating them. And that was always the plan. Part of the — at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes.'" *Id.* ¶ 101[11]; *see also id.* ¶ 12 (alleging that Secretary Kennedy, in an April 9 interview, stated that HHS could not slow down to fix mistakes because doing so "takes too long and you lose political momentum," and that "[t]here are going to be casualties").[12]

---

[8]     *Id.* ¶ 138 (citing Rob Stein, *With Trump coming into power, the NIH is in the crosshairs*, NPR (Nov. 12, 2024), https://perma.cc/6JWQ-UX25).

[9]     *Id.* ¶ 140 (citing Swapna Ramaswamy, *'Deeply disturbing': Musk's 'Hitler didn't murder millions' repost draws outrage*, USA Today (Mar. 14, 2025), https://perma.cc/86VE-7PYE).

[10]     *Id.* ¶ 143 (citing Molly Redden, *et al.*, *"Put Them in Trauma": Inside a Key MAGA Leader's Plans for a New Trump Agenda*, ProPublica (Oct. 28, 2024), https://perma.cc/8PTU-ZQ2T).

[11]     *Id.* ¶ 101 (citing Alexander Tin, *RFK Jr. says 20% of health agency layoffs could be mistakes*, CBS (Apr. 3, 2025), https://perma.cc/EBD7-LEAH).

[12]     *Id.* ¶ 12 (citing CBS News, *Watch: RFK Jr.'s first network TV interview as HHS secretary*, Youtube (Apr. 9, 2025), https://www.youtube.com/watch?v=o2U0csKvqMY).

Defendants' mistakes have caused plaintiffs significant harms, both pecuniary and non-pecuniary.  One terminated plaintiff, who had received "several performance awards" in her role, yet was inaccurately recorded as having received a poor performance rating, alleges that, "[b]ecause she is being terminated just short of five years of federal service, her retirement annuity that would have paid out for the rest of her life did not vest." *Id.* ¶¶ 111, 113.  She "is 68 years old and now in need of a new job." *Id.*  At least two other terminated plaintiffs, who similarly received high commendations for their performance, yet were recorded as having received poor performance ratings, also lost retirement benefits that would have vested just a few months after their alleged wrongful terminations. *Id.* ¶¶ 115, 117, 124, 126.  Another younger plaintiff alleged losing the opportunity to have his student loans forgiven through the Public Service Loan Forgiveness program. *Id.* ¶ 129.  More broadly, plaintiffs also allege suffering lost wages, diminished job opportunities, and increased medical costs to treat mental and physical conditions caused by their unlawful terminations. *Id.* ¶¶ 113, 117, 122, 126, 129, 132, 135.

### C.    Procedural Background

On June 3, 2025, plaintiffs filed this putative class action on behalf of individuals employed by HHS who received a RIF notice or notice of intent to conduct a RIF on April 1, 2025, and whose notice contained information inconsistent with official personnel records. *See id.* ¶¶ 146-151.  Plaintiffs assert two distinct claims under the Privacy Act.  In Count 1, brought pursuant to 5 U.S.C. § 552a(g)(1)(C), plaintiffs argue that their terminations are "adverse determinations" caused by defendants' failure to maintain their records with "accuracy, relevance, timeliness, and completeness." *Id.* ¶¶ 152-158.  In Count 2, brought pursuant to 5 U.S.C. § 552a(g)(1)(D), (o), (p), and (q), plaintiffs contend that they were terminated because of defendants' violations of the Privacy Act's requirements for matching programs. *Id.* ¶¶ 159-169.  Individually, and on behalf

11

of a class, plaintiffs seek actual damages and declaratory relief. *Id.* (Prayer for Relief). Plaintiffs also bring a third count under the Declaratory Judgment Act. *Id.* ¶¶ 152-171.

Defendants now move to dismiss plaintiffs' complaint under Rule 12(b)(1) for lack of jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted, *see* Defs.' Mot. to Dismiss, ECF No. 12; Mem. Supp. Defs.' Mot. to Dismiss ("Defs.' Mem."), ECF No. 12-1, which motion became ripe for resolution on October 22, 2025, *see* Pls.' Opp'n Def.'s Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 14; Reply Supp. Defs.' Mot. to Dismiss ("Defs.' Reply"), ECF No. 18.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish that the court has subject matter jurisdiction over the claims asserted. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted).  In deciding a Rule 12(b)(1) motion, the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the

line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). When considering a Rule 12(b)(6) motion, a court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). Factual disputes generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

## III.    DISCUSSION

The following sections will first address defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), and then discuss defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6). Defendants' arguments for dismissal are not persuasive on either ground and, consequently, as explained in more detail below, defendants' motion to dismiss is largely denied.

### A.    Motion to Dismiss Under Rule 12(b)(1)

Defendants contend that "the CSRA forecloses jurisdiction over Privacy Act claims directed at federal personnel determinations." Defs.' Mem. at 2. In defendants' view, "Congress created a comprehensive remedial scheme that provides for administrative and then judicial review of federal personnel determinations" through the CSRA, and plaintiffs' claims "that they were improperly terminated based on inaccurate personnel records" under the Privacy Act "fall within the heartland of [the CSRA's] exclusive statutory scheme." *Id.* at 1-2. Not so.

Defendants' argument is foreclosed by controlling precedent in the D.C. Circuit, which has taken a "narrow view of CSRA preemption in Privacy Act cases." *Gerlich v. U.S. Dep't of Just.*,

659 F. Supp. 2d 1, 14 (D.D.C. 2009) (discussing *Hubbard v. U.S. Envtl. Prot. Agency, Adm'r*, 809 F.2d 1 (D.C. Cir. 1986), and *Kleiman v. Dep't of Energy*, 956 F.2d 335 (D.C. Cir. 1992)).

In *Hubbard*, an unsuccessful job applicant alleged a Privacy Act violation when the recorded reason for his rejection for a job with a federal agency was not the true reason. The D.C. Circuit declined to hold that the CSRA categorically precluded the district court's jurisdiction over Privacy Act claims in the context of a federal personnel dispute. 809 F.2d at 5-6. Although acknowledging concerns about federal employees raising Privacy Act claims "to circumvent the administrative remedies provided by [the CSRA] for alleged 'prohibited personnel practices,'" the Court also saw an "obvious need to accommodate the two statutory schemes" so as not to eviscerate rights guaranteed under the Privacy Act. *Id.* at 5.

The *Hubbard* Court harmonized the Privacy Act and the CSRA by reaching the merits of the Privacy Act claim, but narrowly construing one of the elements of the claim. *Id.* Specifically, the Court instructed district courts to "carefully analyze the asserted causation link to be certain they are not exceeding their jurisdiction." *Id.* As the Court explained, "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record," but it does not otherwise "shield [federal] employees from the vicissitudes of federal personnel management decisions" not caused by an erroneous record. *Id.* at 5 (emphasis in original). Thus, "[t]o avoid summary judgment [on a Privacy Claim], [a plaintiff] must . . . set forth facts showing that [the agency] relied, in whole or in part, upon inaccuracies in the [challenged] document" in making its adverse determination. *Id.* at 6. Applying this strict causation standard, the D.C. Circuit affirmed summary dismissal of the plaintiff's claim on the ground that the plaintiff had failed to demonstrate that the agency "would have ruled in his favor" "but for inaccuracies in the [allegedly incorrect] document." *Id.*

Six years later, the D.C. Circuit in *Kleiman* reaffirmed the holding in *Hubbard*, similarly reaching the merits of the plaintiff's Privacy Act claim over the government's CSRA preclusion challenge.    There, the Court narrowly construed another element—that the record be "inaccurate"—to avoid a conflict with the CSRA.    956 F.2d at 339; *id.* n.5 ("*Hubbard's* holding was based on the 'actually caused' language; ours is grounded in the reading of 'accurate.'").    In *Kleinman*, the plaintiff argued that his personnel records inaccurately represented his job title because his actual work assignments corresponded to a different job title with higher pay potential. The D.C. Circuit, again presented with the question of CSRA preclusion, "disagree[d] . . . with the district court's conclusion that it . . . lacked jurisdiction over the action."  *Id.*

The *Kleiman* Court reiterated its determination in *Hubbard* that the way "to read the Privacy Act without doing violence to the Civil Service Reform Act" in a case like the plaintiff's is not by finding a lack of subject matter jurisdiction, but by careful application of the elements of the Privacy Act claim.  *Id.* at 338; *see also id.* at 339 (noting that "[t]he district court . . . should have denied the government's motion to dismiss to the extent that motion argued lack of subject matter jurisdiction," but should have granted the motion "that the action be dismissed under Fed. R. Civ. P. 12(b)(6)").    Reaching the merits in *Kleiman*, the Court held that the plaintiff failed to state a claim under Rule 12(b)(6) because the plaintiff conceded that the records "correctly reflect[ed]" his given job tile, and while the plaintiff believed his work responsibilities entitled him to a different title, the Privacy Act only "allows for amendment of factual or historical errors" and "is not . . . a vehicle for amending the judgments of federal officials."  *Id.* 337-38 (internal quotation marks and emphasis omitted).

By 2006, the issue appeared sufficiently settled that the D.C. Circuit reversed summary judgment against a federal employee who had alleged that record inaccuracies caused her

reassignment in violation of the Privacy Act, without any reference to the CSRA or any question as to the district court's jurisdiction. *McCready v. Nicholson*, 465 F.3d 1, 4 (D.C. Cir. 2006); *see also Gerlich v. U.S. Dep't of Just.*, 711 F.3d 161, 173 (D.C. Cir. 2013) (reversing summary judgment against federal job applicants without mentioning the CSRA or questioning jurisdiction). Indeed, even the Department of Justice ("DOJ") recognized, in a 2020 research report, that "the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act claim for damages." Overview of the Privacy Act: 2020 Edition, Dep't of Justice, Off. of Privacy and Civil Liberties ("DOJ Overview of the Privacy Act") (last updated Oct. 22, 2022), https://perma.cc/W9G2-BFB7 (collecting cases).

Accordingly, Judges on this Court have faithfully declined to find that the CSRA precludes federal employees from bringing Privacy Act claims for adverse personnel actions. *See, e.g.*, *Ahuruonye v. Interior*, 312 F. Supp. 3d 1, 14-15 (D.D.C. 2018) (reaching the merits of the plaintiff's Privacy Act claims because, while the Privacy Act "must not be used to circumvent the CSRA's framework," "this Circuit has recognized that the Privacy Act permits a federal job applicant [or employee] to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record" (alteration and emphasis in original) (cleaned up)); *Ashbourne v. Hansberry*, 2014 WL 12666716, at *1 (D.D.C. Sept. 3, 2014) (BAH) (denying motion to dismiss terminated federal employee's Privacy Act claims, where the government argued CSRA preclusion, *see* No. 12-1153, ECF No. 52 at 5-6, 36); *Feldman v. CIA*, 797 F. Supp. 2d 29, 45 (D.D.C. 2011) (BAH) (recognizing the "tension between the Privacy Act and the CSRA," and concluding that, "[a]s instructed by the D.C. Circuit, the Court will [exercise jurisdiction but] 'carefully analyze the asserted causation link' between any alleged inaccuracies and the alleged adverse determination"); *Gard v. Dep't of Educ.*, 789 F. Supp. 2d 96, 106 (D.D.C. 2011) (noting

that the CSRA "does not, contrary to the defendant's suggestion, necessarily preempt Privacy Act claims simply because the facts underlying those claims concern, in part, prohibited personnel practices"); *Peter B. v. CIA*, 620 F. Supp. 2d 58, 76 (D.D.C. 2009) (explaining that if the plaintiff, a terminated federal employee, "seeks to correct factually inaccurate records," then his claim "would not be precluded by the CSRA," but if the plaintiff "disagrees with the defendants' judgments contained in his records," then that disagreement "would be an impermissible attempt to circumvent the CSRA"); *Greenhouse v. Geren*, 574 F. Supp. 2d 57, 68-69 (D.D.C. 2008) ("While Defendants argue that Plaintiff is improperly using the Privacy Act to challenge a personnel decision subject only to the CSRA, the Court finds that Plaintiff has alleged facts that, if true, could make out a claim of an adverse personnel decision based upon an erroneous record in violation of the Privacy Act."); *Doe v. Goss*, No. 04-cv-2122, 2007 WL 106523, at *8 (D.D.C. Jan. 12, 2007) ("A Privacy Act claim survives CSRA preclusion in this jurisdiction if a plaintiff shows the harm alleged was *actually caused* by the alleged violation." (emphasis in original)).

Defendants' principal contention is that the Supreme Court's decision in *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012)—which neither addressed or even mentioned the Privacy Act or harmonized that law's jurisdictional reach with that of the CSRA—has implicitly abrogated D.C. Circuit precedent. *See* Defs.' Mem. at 1-2 (citing *Elgin*); Defs.' Reply at 3 ("The first and only question this Court need answer is whether *Elgin* controls this case."); *id.* at 17 (arguing that, with respect to cases in which "courts in this District and the D.C. Circuit have exercised jurisdiction over Privacy Act claims directed towards adverse personnel decisions," the cases predating *Elgin* have been "abrogated" and the cases after *Elgin* are wrongly decided). This argument is unpersuasive.

In *Elgin*, former federal employees who were discharged for military draft evasion filed suit in district court challenging the draft's constitutionality and seeking "equitable relief," including "reinstatement to their former positions, backpay, benefits, and attorney's fees." *Elgin*, 567 U.S. at 7-8. The Supreme Court affirmed the dismissal for lack of jurisdiction, holding that the CSRA's remedial scheme provided "the exclusive means of review for constitutional claims" in the plaintiffs' case. *Id.* at 8. Importantly, the Court's holding was informed by a few considerations: Congress's intent to channel constitutional claims through the MSPB was "fairly discernible" as Congress provided no statutory indication otherwise, *id.* at 12; the plaintiffs could still receive judicial review of their constitutional claims in the Federal Circuit after exhausting administrative remedies, *id.* at 16-21; and equitable relief such as reinstatement and backpay were "precisely the kinds of relief that the CSRA empowers the MSPB and the Federal Circuit to provide," *id.* at 22.

As plaintiffs compellingly argue here, the reasoning in *Elgin* does not extend to plaintiffs' Privacy Act claims for several reasons. *See* Pls.' Opp'n at 18-21. First, *Elgin* concerned only constitutional claims and did not involve a competing statutory scheme. The *Elgin* Court's discussion of Congress's intent in providing the CSRA remedial scheme, therefore, is not dispositive in this case. Much like the CSRA, the Privacy Act contains its own "detailed system of remedies," *Houston v. U.S. Dep't of Treasury*, 494 F. Supp. 24, 29 (D.D.C. 1979), which raises competing considerations as to congressional guidance and intent not contemplated in *Elgin*.

Second, unlike the constitutional claims in *Elgin*, which were merely being channeled to another forum, judicial review of plaintiffs' Privacy Act claims would be foreclosed entirely if CSRA preclusion applied. *See Elgin*, 567 U.S. at 10 ("[T]he CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in

18

the Federal Circuit.").  The Federal Circuit has concluded that Privacy Act claims cannot be brought before the MSPB, with the result that adoption of defendants' argument would effectively eliminate any forum to hear plaintiffs' Privacy Act claims.  *Carell*, 131 F. App'x at 299 (holding that "the Privacy Act . . . does not provide a basis for [Merit Systems Protection] Board jurisdiction" because "claims under the Privacy Act must be brought in federal district court"). Even the DOJ agrees.  *See* DOJ Overview of the Privacy Act ("[N]either the Merit Systems Protection Board nor the U.S. Tax Court has jurisdiction over Privacy Act claims.").  Thus, the reasoning that the CSRA simply denies federal employees "an *additional* avenue of review in district court," *Elgin*, 567 U.S. at 12 (emphasis added), would not apply to plaintiffs' claims, which can *only* be brought in federal district court.  *See Cofield v. United States*, 64 F. Supp. 3d 206, 214 (D.D.C. 2014) ("The federal courts . . . have exclusive jurisdiction over any claim Plaintiff may be asserting under . . . the Privacy Act.").[13]

Third, the D.C. Circuit in *Lucas v. American Federation of Government Employees* has recently adopted a far narrower interpretation of CSRA preclusion than defendants seek here, rejecting a "categorical preclusion rule" in favor of a "statute-specific analysis."  151 F.4th 370, 385 (D.C. Cir. 2025).  *Lucas* addressed claims under Title VII and the Americans with Disabilities Act ("ADA").  There, the D.C. Circuit rejected defendant-unions' CSRA preclusion argument,

---

[13]    Defendants contend that "meaningful judicial review remains available," even if Privacy Act claims are foreclosed, because plaintiffs can still challenge the terminations themselves by "appeal[ing] to the MSPB" and then the Federal Circuit, which can remedy their injuries such as "by ordering reinstatement with backpay."  Defs.' Mem. at 15 (citation omitted).  This argument, however, not only fails to recognize that a plaintiff must prove different elements under the CSRA compared to under the Privacy Act, but also glosses over the differences in remedies between the two statutes.  Under the CSRA, the MSPB has "broad discretion in the type and scope of the corrective action ordered, if any."  *Hubbard v. Merit Sys. Prot. Bd.*, 205 F.3d 1315, 1320 (Fed. Cir. 2000); *see also* 5 U.S. Code § 1214(g)(2) (listing possible "corrective action" that the MSPB "may" order, such as reinstatement, attorney's fees, back pay, and any other reasonable and foreseeable consequential and compensatory damages).  In contrast, the Privacy Act guarantees that, for meritorious claims, "the United States *shall* be liable to the individual in an amount equal to the sum of actual damages," which shall not be "less than the sum of $1,000," as well as costs and attorney's fees.  5 U.S.C. § 552a(g)(4)(A).  Plaintiffs thus cannot get "meaningful judicial review" of their Privacy Act claims by appealing their terminations to the MSPB.

reasoning that although "Congress passed the CSRA largely to streamline preexisting litigation and consolidate review of similar issues in a single forum," "no statute pursues a single policy at all costs." *Id.* at 383 (alteration and internal quotation marks omitted). Noting the competing statutory interests between Title VII and the ADA on the one hand, and the CSRA on the other, the Court distinguished between "'general,' 'catchall' statutes that could cover 'a vast number of cases' that Congress intended to funnel through the CSRA's process," and statutes that "address . . . specific evils" and would not "swallow the CSRA . . . whole." *Id.* The Administrative Procedures Act was cited as an example of a "general, catchall" statute, while the Court concluded that Title VII and the ADA qualified as more "specific" because those statutes addressed "invidious discrimination" only rather than "labor-management relations writ large." *Id.* (internal quotation marks omitted). Applying that logic here, the Privacy Act's "detailed instructions" to agencies on how to "manag[e] their records," *Doe*, 540 U.S. at 618, combined with *Hubbard's* and *Kleiman's* factual limitations narrowing the scope of recovery under the Privacy Act, similarly exhibit no "defect of generality" that would suggest "that allowing claims like [plaintiffs'] to proceed would swallow the CSRA . . . whole," *Lucas*, 151 F.4th at 385.

Fourth, relatedly, *Lucas's* reiteration post-*Elgin* that CSRA preclusion depends on a "statute-specific analysis," rather than any "categorical" rule, provides no reason to think that *Elgin* abrogated *Hubbard*. Indeed, *Hubbard* engaged in precisely the type of statute-specific analysis endorsed in *Lucas*. *See Hubbard*, 809 F.2d at 5 (determining how "to accommodate the two statutory schemes").

Finally, the Privacy Act contains its own express grant of jurisdiction to the federal courts—separate from general federal question jurisdiction under 28 U.S.C. § 1331, as was the case in *Elgin*—which also weighs strongly against the applicability of CSRA preclusion. *See* 5

U.S.C. § 552a(g)(1) ("[T]he district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.").   As the D.C. Circuit has explained, "express" jurisdictional grant is "significant" to the preclusion analysis, because "when Congress wants to preserve remedies outside the CSRA, it does so expressly."  *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 176-77 (D.C. Cir. 2013) (internal quotation marks omitted) (holding that review statute governing Transportation Security Administration actions with express grant of jurisdiction was not precluded by the CSRA).

Citing largely out-of-circuit precedent, defendants warn that permitting review here "would open the back door to judicial review to perhaps an overwhelming number of CSRA claims."  Defs.' Mem. at 18-19 (quoting *Houlihan v. OPM*, 909 F.2d 383, 385 (9th Cir. 1990)). Notwithstanding the potential thousands of HHS employees terminated on April 1, 2025, potentially subject to the same treatment as the named plaintiffs, this concern is overblown.  The jurisdictional determination here adheres closely to *Hubbard* and *Kleiman*, controlling precedent that has been faithfully applied in this Court for the past four decades.  As history reveals, defendants' hyperbolic floodgate prediction has not materialized.  This is likely because, notwithstanding the courts' exercise of jurisdiction, Privacy Act claims adjudged on the merits are often found lacking sufficient facts to prove the requisite elements as narrowly construed under the direction of *Hubbard* and *Kleiman*.  *See, e.g.*, *Ashbourne*, 2015 WL 11303198, at *6 (D.D.C. Nov. 24, 2015) (BAH) (denying Rule 12(b)(1) motion to dismiss, but granting summary judgment to the government after discovery because the plaintiff failed to meet the factual elements), *aff'd*, 703 F. App'x 3 (D.C. Cir. 2017); *Gard*, 789 F. Supp. 2d at 106 (noting, at summary judgment, that a plaintiff's "claims must fail to the extent that he has not produced any evidence supporting a reasonable inference that a Privacy Act violation itself actually caused the adverse events of which

he complains"); *Lee v. Geren*, 480 F. Supp. 2d 198, 209-10 (D.D.C. Mar. 29, 2007) (exercising jurisdiction over federal employee's Privacy Act claim but rejecting claim on the merits for, *inter alia*, failure to establish that "reliance on the allegedly inaccurate records proximately caused his suspension"). Defendants' floodgates argument thus merits little weight in this Circuit.

In sum, defendants' motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction is denied.[14]

### B.    Motion to Dismiss Under Rule 12(b)(6)

Defendants alternatively argue that plaintiffs' claims under 5 U.S.C. § 552a(g)(1)(C) and § 552a(g)(1)(D) must both be dismissed for failure to state a claim under Rule 12(b)(6), because "[p]laintiffs fail to establish that any of the alleged Privacy Act violations were causally linked to the claimed adverse determinations or effects—i.e., Plaintiffs' separation from HHS—and that Defendants' alleged violations were carried out intentionally or willfully." *Id.* at 21; *see also* Defs.' Mem. at 27 (stating that the "same reason" provided for finding a lack of causation requires dismissal of both of plaintiff's claims); *id.* 28-32 (treating arguments about lack of intentionality and willfulness as applying to both claims). For the reasons discussed below, defendants' motion to dismiss under Rule 12(b)(6) is denied as well.

#### 1.   *"Actually Caused" Requirement*

To plausibly allege that a termination was "actually caused" by inaccurate or incomplete records, a plaintiff must show "but-for causation—i.e., the adverse personnel action would not have occurred but for reliance upon the offending record." *Gerlich*, 659 F. Supp. 2d at 15 (discussing *Hubbard* and *Kleiman*).

---

[14]    Since defendants' Rule 12(b)(1) motion is denied under controlling D.C. Circuit precedent, plaintiffs' alternative arguments that "[t]raditional tools of statutory interpretation confirm that the CSRA does not preclude Plaintiffs' Privacy Act claims," Pls.' Opp'n at 22-31, and that "the *Thunder Basin* factors favor Plaintiffs," *id.* at 31-34 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)), need not be reached.

At the motion to dismiss stage, plaintiffs' complaint has provided ample support for a plausible inference that defendants' inaccurate documentation of their performance ratings "actually caused" their terminations in violation of § 552a(g)(1)(C) and § 552a(g)(1)(D). *See* Pls.' Opp'n at 27 ("Plaintiffs' matching program claims [under § 552a(g)(1)(D)] rise and fall on a similar causation analysis [as claims under § 552a(g)(1)(C)]."). All seven individual plaintiffs allege that they received RIF Notices that reflected inaccurate, lower performance ratings. *Id.* ¶¶ 111, 115, 119, 124, 128, 131, 134. They further allege that defendants considered these "inaccurate performance ratings when determining which employees and offices in HHS to cut, and gave preference to higher-performing offices as measured by the inaccurate records." *Id.* ¶ 56. As support, plaintiffs allege that "[t]he Trump Administration has consistently insisted that performance is an important and decisive factor in its approach to cutting the federal government," *Id.* ¶ 54, quoting a social media post from the President one month before the mass terminations stating, "It's very important that we cut levels down to where they should be, but it's also important to keep the best and most productive people," *id.*, as well as a joint memorandum from OPM and OMB in February 2025 directing agencies to prioritize "[r]emoving underperforming employees," *id.* Plaintiffs also allege that OPM directed agencies to send a report listing "all employees who received less than a 'fully successful' performance rating in the past three years." *Id.* ¶ 55. As a legal matter, plaintiffs note that performance ratings directly impact an employee's chance of termination in the event of a RIF, because performance is one of four factors among which impacted employees are ranked. *Id.* ¶ 57. Considered together, these allegations plausibly and clearly state that inaccurate performance records caused plaintiffs' terminations.

Defendants' primary response is to dispute the factual allegations in plaintiffs' complaint, proffering other statements made by HHS after the mass terminations as contrary evidence. Defs.'

Mem. at 21-22. For example, defendants urge that judicial notice should be taken of HHS's public representation after conducting the RIF that, "although some RIF notices included information about retention standing and retention registers based on veterans' preference, service computation date, performance ratings, and tenure, these were not a factor in [an employee's] separation under this RIF." *Id.* at 22. In other words, defendants ask this Court to take as absolutely true evidence that may be at odds with plaintiffs' allegations, before any probing discovery, and also draw the inference consistent with defendants' belief that this evidence "establish[es] that performance ratings and other information contained in the RIF notices would have no bearing on decisions to terminate certain employees." *Id.* at 21.

Defendants' disagreement with plaintiffs' alleged facts misunderstands the legal standard on a motion to dismiss. At this stage, the Court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n*, 977 F.3d at 1249. "Fact-specific questions cannot be resolved on the pleadings," *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022), as the court's "role is not to speculate about which factual allegations are likely to be proved after discovery," *Harris*, 791 F.3d at 70. The parties here, with the full benefit of discovery, will have every opportunity to contest the true cause of the terminations prior to a final judgment. *See, e.g.*, *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F.Supp.2d 214, 222 (D.D.C. 2013) ("[Q]uestion[s] of fact . . . [are] more appropriately addressed on summary judgment or at trial" (citation omitted)). Defendants' motion to dismiss as to causation is denied.[15]

---

[15] As plaintiffs have plausibly alleged that inaccurate records of their performance ratings caused their terminations, plaintiffs' additional arguments as to other inaccuracies and causation theories need not be considered to resolve the pending dismissal motion. *See, e.g.*, Compl. ¶¶ 50, 51; Pls.' Opp'n at 36-37.

## 2. *"Intentional or Willful" Requirement*

Defendants' argument that plaintiffs "fail to plausibly allege that any violations were intentional or willful," pursuant to 5 U.S.C. § 522a(g)(4), falls short for similar reasons. Defs.' Mem. at 28. An agency acts in an intentional or willful manner "either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act. The violation must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Deters*, 85 F.3d at 660 (citations and alteration omitted).

Plaintiffs' complaint has alleged sufficient facts suggesting that defendants' violations of the Privacy Act were "intentional or willful." For instance, plaintiffs point to HHS Secretary Kennedy's public acknowledgment that HHS knew mistakes were being made in hastily carrying out the RIF: "Personnel that should not have been cut, were cut. We're reinstating them. *And that was always the plan*. . . . [W]e're going to do 80% cuts, but 20% of those are going to have to be reinstated, because *we'll make mistakes*." Compl. ¶ 10 (emphasis added). Despite the Secretary's representation, none of the individual plaintiffs in this case appear to have been reinstated. *See id.* ¶¶ 113, 117, 122, 126, 129, 132, 135. Plaintiffs also quote the Secretary stating in an interview just days after the terminations that reviewing employee cuts before firing them "takes too long and you lose political momentum." *Id.* ¶ 12. There will be "casualties," Secretary Kennedy continued. *Id.* Plaintiffs allege that "[o]thers involved in the April 1 cuts, including Elon Musk's DOGE and Russell Vought's OMB, shared similar motivations to cut quickly without taking the time to ensure complete and accurate records as required by the Privacy Act." *Id.* Plaintiffs further allege that the leaders of HHS, DOGE, OPM, and OMB—"architects" of the April 1 cuts—"have long shown antipathy toward the federal workforce" and "disdain for federal workers," quoting various public statements. *See, e.g.*, *id.* ¶ 138 (quoting Secretary Kennedy: "FDA's war on public health is about to end . . . . If you work for the FDA and are part of this corrupt system, I have two

messages for you: 1. Preserve your records, and 2. Pack your bags."); *id.* ¶¶ 27, 139 (quoting Musk: "Stalin, Mao, and Hitler didn't murder millions of people. Their public sector employees did."); *id.* ¶ 143 (quoting Vought: "We want the bureaucrats to be traumatically affected." "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains.").  Plaintiffs believe that "the animus of these architects towards federal workers led them to ignore the many obvious red flags about the accuracy of the personnel data they were relying on, in order to terminate more people more quickly." *Id.* ¶ 145.

Defendants offer their own interpretation of the facts alleged by plaintiffs.  For example, defendants argue that the mistakes referenced by Secretary Kennedy were about cutting entire "division[s]" which is unrelated to "personnel records," and that Secretary Kennedy's promise to fix any mistakes negated a finding of willfulness or intentionality.  *See* Defs.' Mem. at 39. Defendants further maintain any mistakes were not intentional or willful because HHS "delay[ed] the RIF notices to provide additional time for review," Defs.' Reply at 23—a delay amounting to one, single, two-day weekend to review records resulting in 10,000 terminations, Compl. ¶ 1. Defendants also assert that public statements made by HHS after the terminations "made clear that any inaccuracies were not relevant to RIF determinations," arguing that HHS's self-representations dispositively prove that no Privacy Act violations occurred. *Id.* at 30.

Again, defendants' arguments raise disputes of fact that are inappropriate to resolve at this early stage before probing discovery of the actions of HHS, OMB, OPM and DOGE. *See Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) ("[I]dentifying the government's intent in this case raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion."); *see also United States v. Newman*, 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017) ( "The Court will not dismiss this case at the outset merely because the allegations in the complaint are rebutted

by assertions about Defendant[s'] state of mind in [their] briefing on [their] motion to dismiss."). Accepting plaintiffs' well-pleaded facts as true, as required on a motion to dismiss, plaintiffs have plausibly alleged that defendants knew that significant accuracy issues plagued the personnel records upon which they based their cuts, yet proceeded with the terminations anyway. Defendants' motion to dismiss as to intent is thus also denied.

### C.    Motion for Dismissal of All Non-HHS and Individual Defendants

Finally, defendants argue that even if plaintiffs have plausibly alleged a claim against HHS and its component entities, claims against non-HHS defendants DOGE, OPM, and OMB, and claims against the individual defendants sued in their official capacities, must be dismissed. Defs.' Mem. at 33-34. Each argument is discussed below.

#### 1.    Defendants OPM, OMB, and DOGE

Defendants unpersuasively contend, in one cursory paragraph, that plaintiffs "have not alleged that any of the non-HHS Defendants are responsible for maintaining the records at issue." Defs.' Mem. at 34. Under the Privacy Act, to "maintain" a record is defined broadly to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3).

Plaintiffs' complaint alleges ample facts suggesting the involvement of OPM, OMB, and DOGE in receiving and reviewing personnel records in preparation for the RIF. Compl. ¶¶ 84-100. For example, plaintiffs allege that OPM directed HHS to submit certain employee-specific data— including "[n]ame, job title, pay plan, series, grade, agency, component, and duty station"—about "employees who received a less than 'fully successful' performance rating in the last three years." *Id.* ¶ 86. Plaintiffs also allege that OPM and OMB ordered HHS to prepare and submit a list of "employees performing functions not mandated by statute or regulation," certain "essential" job positions "by agency and subcomponent," and "granular record data" about HHS's employees for OMB and OPM to "review." *Id.* ¶¶ 88, 90. As to DOGE, plaintiffs allege that DOGE

representatives demanded, and received, flawed data from FDA that included lists of employees supporting "mission critical" systems, *id.* ¶ 95, which DOGE then used to evaluate proposed layoffs and weigh in on the final decisions "about who and where to cut," *id.* ¶ 99. At this stage, these allegations are more than sufficient to plausibly establish that OPM, OMB, and DOGE "maintain[ed], collect[ed], use[d], or disseminate[d]" plaintiffs' personnel records. 5 U.S.C. § 552a(a)(3).

Plaintiffs' complaint also sufficiently alleges that OPM, OMB, and DOGE's actions in "maintain[ing]" the records, as understood under the Privacy Act, was "causally link[ed] . . . to Plaintiffs' adverse personnel decisions," Defs.' Reply at 25. For instance, plaintiffs allege that Secretary Kennedy, in a recent congressional testimony, credited Musk for being "deeply involved in deciding where HHS would cut." Compl. ¶¶ 137, 139; *id.* ¶ 139 (quoting Secretary Kennedy, "Elon Musk gave us help in figuring out where there was waste, fraud and abuse in the department, but it was up to me to make the decision."). According to plaintiffs, "Musk was acting in his role as *de facto* head of DOGE and exercised substantial authority independently of the President in his communications and coordination with HHS and DOGE, and would have compiled and maintained inaccurate and incomplete HHS records as part of these actions." *Id.* Plaintiffs also allege that Brad Smith, another DOGE official, helped administer the cuts at HHS. *Id.* ¶ 72. Further, plaintiffs detail the role of OPM and OMB in collecting personnel data from HHS in preparation for the challenged RIF, *see, e.g.*, *id.* ¶¶ 85-91, and allege that "officials from DOGE, OPM, and OMB played an important role in directing where to cut at HHS" by "match[ing] together various employee-record inputs for HHS personnel" and "then execut[ing] those cuts." *Id.* ¶¶ 99-100. Taken as true, these allegations suffice to plausibly establish a causal link between defendants' actions and plaintiffs' terminations.

### 2.  *Individual Defendants Sued in Their Official Capacities*

Defendants seek dismissal of all "individual Defendants named in their official capacities,"

Defs.' Mem. at 33, arguing that "the Privacy Act creates a cause of action against only federal

government agencies and not . . . individual officials," *id.* (quoting *Abdelfattah v. Dep't of

Homeland Sec.*, 787 F.3d 524, 533 n.4 (D.C. Cir. 2015)).  Plaintiffs do not dispute that under 5

U.S.C. § 552a(g)(1), Privacy Act claims must be brought against a federal "agency," Pls.' Opp'n

at 44, defined as "any executive department, military department, Government corporation,

Government controlled corporation, or other establishment in the executive branch of the

Government (including the Executive Office of the President), or any independent regulatory

agency."  5 U.S.C. § 552(f)(1).  Plaintiffs contend, however, that "when an agency official is sued

in his or her official capacity, the official *becomes* the agency for purposes of litigation."  Pls.'

Opp'n at 44 (emphasis in original).

Whether agency officials can be sued in their official capacities under the Privacy Act has

not been directly addressed in the D.C. Circuit, with divided views expressed by Judges on this

Court.  *Compare, e.g.*, *Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 450 (D.D.C. 1991) ("[T]he

Privacy Act provides for civil remedies only against an agency, not against individuals. . . .

Accordingly, all Privacy Act claims plaintiff asserts against defendants other than the agencies[,]

[which includes agency officials sued in their official capacities,] must be dismissed.") *and Dick

v. Holder*, 67 F. Supp. 3d 167, 172, 176 (D.D.C. 2014) (dismissing Privacy Act claims against

officers sued "in their official capacities" because "the law is clear that only federal agencies, not

individuals, are the proper defendants for a Privacy Act cause of action") *with Ashbourne v.

Hansberry*, 302 F. Supp. 3d 338, 346 (D.D.C. 2018), *aff'd*, No. 25-5146, 2025 WL 3493414 (D.C.

Cir. Dec. 4, 2025) (holding that plaintiff "stated a Privacy Act claim against the DHS defendants

in their official capacities" (capitalization altered)) *and Jarrell v. Tisch*, 656 F. Supp. 237, 238

(D.D.C. 1987) ("The current Postmaster, sued in his official capacity as the legal embodiment of the Postal Service, would also be the appropriate defendant under the Privacy Act.").[16]

In any event, this open question need not be addressed here as plaintiffs' claims against individual defendants may be dismissed for another reason entirely: redundancy. The parties do not dispute that defendant agencies—HHS and its subcomponents, plus OMB, OPM, and DOGE— are proper defendants for the purposes of 5 U.S.C. § 552a(g)(1). *See* Defs.' Mem. at 33-34; Pls.' Opp'n at 44-45. Plaintiffs also concede that because they have "named as Defendants every relevant agency directly," dismissing the individual defendants "would have no effect on the scope of the litigation." Pls.' Opp'n at 45. Accordingly, plaintiffs' claims against the individual agency officials may be dismissed as duplicative of their claims against the officials' respective agencies. *See Pinson v. U.S. Dep't of Just.*, No. 18-cv-486, 2022 WL 703924, at *6 (D.D.C. Mar. 9, 2022) ("[B]ecause the Court . . . grants [the plaintiff] leave to bring Privacy Act claims against the [Bureau of Prisons], any official-capacity Privacy Act claims against the [officials] would be dismissed as duplicative of the Privacy Act claims against the [Bureau of Prisons]."); *see also Placide Ayissi-Etoh v. Mae*, 49 F. Supp. 3d 9, 14 (D.D.C. 2014), *aff'd sub nom. Ayissi-Etoh v. Fannie Mae*, 621 F. App'x 677 (D.C. Cir. 2015) ("As the individual Defendants are only being sued in their official capacities, the claims against them are redundant and should be dismissed entirely."); *Grissom v. District of Columbia*, 853 F.Supp.2d 118, 125 (D.D.C. 2012) ("Based upon the understanding that it is duplicative to name both a government entity and its employees in their

---

[16] Plaintiffs incorrectly assert that "every case" cited by defendants "on this point" concern individual defendants sued in their individual capacities. Pls.' Opp'n at 44. In fact, one of defendants' cited cases—*Dick v. Holder*, 67 F. Supp. 3d 167 (D.D.C. 2014)—involved individual officers sued in their official capacities. *Id*. at 176.

official capacity, courts routinely dismiss claims against the officials to conserve judicial resources when the entity itself is also sued." (internal quotation marks omitted)).[17]

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), ECF No. 12, is DENIED as to agency defendants HHS, OMB, DOGE, OPM, ACF, FDA, and CDC, and GRANTED as to individual defendants Robert F. Kennedy, Jr., Russell Vought, Elon Musk, Amy Gleason, Charles Ezell, Andrew Gradison, Martin Makary, Jim O'Neill, and Susan Monarez, all named in their official capacities.

Consistent with this Court's July 10, 2025, Minute Order granting, *inter alia*, the parties' Joint Motion to stay the deadline for plaintiffs to move for class certification until resolution of defendants' motion to dismiss, *see* Jt. Mot. Extend Resp. Pleading Deadline and Stay LCvR 23.1(b) Deadline for Plaintiffs' Mot. for Class Certification at 2, ECF No. 10, the parties are directed, by February 6, 2026, to submit the Joint Meet and Confer Report, including a proposed schedule for addressing plaintiffs' anticipated motion for class certification, under Federal Rule of Civil Procedure 26(f). *See* Standing Order ¶ 4, ECF No. 5.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  January 22, 2026

**BERYL A. HOWELL**
United States District Judge

---

[17]    Since individual plaintiffs have plausibly alleged viable claims under the Privacy Act, defendants' arguments regarding declaratory relief, Defs.' Mem. at 32, and class allegations, *id.* at 34, need not be reached at this early stage. *See* Defs.' Mem. at 45 (defendants acknowledging that their arguments about declaratory relief and class allegations apply only "*[i]f* this Court finds that it lacks jurisdiction over Plaintiffs' Privacy Act claims or that these Plaintiffs have failed to state a claim under the Privacy Act" (emphasis added)).